HARMON B. W. HAFF, as Sole Surviving Partner of the Firm of W. P. W. HAFF, Appellant, *v.* LONG ISLAND FUEL CORPORATION, Respondent.

Second Department, June 23, 1931.

*James M. Gorman* [*Richard F. Lenahan* with him on the brief], for the appellant.

*Remsen B. Ostrander*, for the respondent.

DAVIS, J. On the trial the complaint was dismissed at the close of the plaintiff's case. We need to consider on this appeal the sole question whether the evidence, viewed in its most favorable light, presented a question of fact.

The plaintiff has sued to recover on notes aggregating $37,000, all past due. The principal defense is that they were not issued by a duly authorized officer of the defendant corporation.

The history of the transaction goes back to about 1906. W. P. W. Haff was in the wholesale coal business, with his office at No. 1 Broadway, New York city. In the year 1913 he took into partnership with him one of his sons, Harmon B. W. Haff. The firm name remained as before — " W. P. W. Haff." There was another son, W. P. W. Haff, Jr.

About 1906, Haff, Sr., and his sons had a retail copartnership on Long Island, with yards at Lynbrook, Laurelton, Freeport and Rockville Centre. We may assume that this retail business was organized to find employment for the sons, and perhaps to furnish an outlet for coal sold by Haff. It is claimed the business was loosely conducted, and payments for coal were not kept up. In 1911 there were four retail corporations in the respective towns organized to succeed the partnership. Evidently the business did not prosper, so in 1916 the four companies were consolidated into the Long Island Fuel Corporation. The stock of this company was

owned almost entirely by the Haffs — Haff, Sr., holding $378\frac{1}{3}$ shares, Harmon $378\frac{1}{3}$, Haff, Jr., $233\frac{1}{3}$; with E. W. Brown holding 5 shares, and three dummy directors the other 5 — the total capital stock being 1,000 shares. Haff, Sr., was president and a director; Harmon was vice-president, but not a director. Brown was a director, secretary, treasurer and general manager. There were three other directors having no interest in the company and furnished as " dummies " by the attorney who organized the corporation.

The directors held their first meeting on August 22, 1916, for the purpose of organization. Whether there was another meeting later for some formal purpose is not clear. At any rate, it is conceded that there was no meeting of the directors from October 3, 1916, to May 16, 1919. Apparently there was no meeting of the stockholders during that period, though we find no formal proof on that subject.

From the proof, and from inferences readily drawn, it may be said that the four corporations were poorly managed, that their debts had accumulated, and that the consolidation was an effort to change the current of unsuccessful business. A large amount of money was due to the Haff firm. The new corporation assumed the debt. But the significant feature of the change was that a new man, Brown, was brought in, given corporate office, and made general manager.

Haff, Sr., as we have said, was president and given by the by-laws the usual powers. So far as it appears he neither assumed nor exercised any authority in that capacity. Brown, as treasurer, had delegated to him in the by-laws the custody of corporate funds to deposit " in such bank or banks as the directors may elect," and the power to sign checks, notes and the like, disbursing all sums " under the direction of the president." His duties as general manager were not defined.

As a matter of fact, Brown seems to have had entire control and management of the corporation, eventually becoming its president after the death of Haff, Sr. It may be added that Brown had died before the trial of this action, so important evidence was not available.

Evidently the burden of indebtedness owing to the Haff firm was greater than Brown could carry. Haff, Sr., was getting old, and was ill and about to go away for his health. Apparently, on behalf of his firm, he wanted the matter of the debt adjusted and closed. He employed a lawyer and an accountant to go over the books of the corporation late in 1917. These investigations disclosed that the corporation was owing the Haff firm upwards of

$135,000. Brown, representing the corporation, made an offer of compromise to the lawyer of $65,000. This was accepted, and a written sealed agreement was entered into providing for the delivery of sixty-five notes of $1,000 each, payable one each month, with interest, beginning February 27, 1918. Haff, Sr., had gone to Florida at this time, so the agreement was signed by Harmon for the firm, and by Brown, as treasurer, for the corporation; and the latter also signed the notes. Haff, Sr., seems never to have been active in the affairs of the firm or to have had anything to do with the corporation after the initiation of the negotiations for a compromise. Returning from Florida, he soon went to California, where he died on February 22, 1919.

These notes, to the extent of $28,000, have been paid by the corporation — it may be assumed under the management of Brown. For years no one having any interest in the corporation questioned the validity of either the original debt or the compromise, or raised any objection to the payment of the notes as they fell due. Whether there is some new control does not appear, but the corporation is now resisting payment on the ground that the notes were issued without authority. During all the years preceding this suit no minority stockholder voiced any grievance. It is rather late to begin digging up old bones.

This was undoubtedly a family corporation, with the directors inert and the management left entirely in the hands of Brown by the direction of Haff, Sr., and by common consent. Under such circumstances the powers of Brown as general manager were ample, as long as he acted honestly and in good faith in the interest of the corporation. (Fletcher, Cyclopedia of the Law of Private Corporations, pp. 3090–3092, 3269, 3293, 3294, 3309; *First Trust Co.* v. *Miller*, 160 Wis. 336; *Martin* v. *Webb*, 110 U. S. 7.) The fact that he signed as treasurer is of no importance. The question is whether he had authority to make the agreement and sign at all. There had been no regard for the by-laws during the existence of the corporation, and the defendant cannot now take advantage of such delinquency. (Fletcher, *op. cit. supra*, p. 1039.) When directors are not functioning there must be some one to carry on the business of the corporation.

To be sure, Haff, Sr., was, nominally at least, the president of the corporation with which his firm was dealing. His firm had been selling it coal during its entire existence, and a debt remained unpaid by it. This debt, in part at least, antedated the organization of the corporation, and was all contracted in the ordinary course of trade. It is difficult to see just how the debt could be collected if we apply the strict rule urged by respondent, that an officer may not make a contract with his corporation of which he is

a beneficiary, whether advantageous or disadvantageous. (*Munson* v. *Syracuse, G. & C. R. R. Co.*, 103 N. Y. 58.) That rule is inapplicable to the state of affairs here. It cannot be invoked to resist the payment of a recognized just debt. In the first place, the compromise was scarcely a contract at all. It amounted to a gift to the corporation of more than fifty per cent of the debt, with permission to pay the remainder then due in a series of notes to become due over a long period of time. The corporation was the beneficiary.

In the management and affairs of a family corporation, irregularities not directly harmful in their nature will be overlooked, and invalidity will not be sought if the declaration of illegality would work injustice. (*Mitchell* v. *Forest City Printing Co.*, 107 Misc. 709; affd., 187 App. Div. 743.) " Courts are not to shut their eyes to the realities of business life." (*Barkin Construction Co.* v. *Goodman*, 221 N. Y. 156, 161.) We cannot view with approval the effort to escape payment of an apparently legitimate obligation by resort to means so technical, relating to the internal management of this family corporation, lax and irregular as the methods undoubtedly were. ·

Very likely, as a question of fact, there has been ratification of the contract by the corporation. The legal question is linked with the one already discussed, so we need not pursue it further. We hold that the proof presented questions of fact, and that it was error to dismiss the complaint.

The judgment should be reversed on the law and a new trial granted, with costs to the appellant to abide the event.

LAZANSKY, P. J., YOUNG, KAPPER and CARSWELL, JJ., concur.

Judgment reversed upon the law and a new trial granted, with costs to appellant to abide the event.