FEHR BROS., INC., Appellant, v ALAN G. SCHEINMAN, Respondent.

First Department, December 4, 1986

## APPEARANCES OF COUNSEL

*Michael A. Greenberg* of counsel *(Graubard Moskowitz Dannett Horowitz & Mollen,* attorneys), for appellant.

*Jeff Morgenstern* of counsel *(Abel Jack Schwartz* of counsel; *Schwartz, Sachs & Kami, P. C.,* attorneys), for respondent.

## OPINION OF THE COURT

CARRO, J.

By agreement, dated January 28, 1980, which was incident to a contract to sell and deliver merchandise to S.A.L. Communications, Inc., plaintiff Fehr Bros., Inc., obtained a guarantee of indebtedness from defendant Alan G. Scheinman, the president of S.A.L. Communications, Inc. The agreement stated that defendant's liability for the corporation's debts was unconditional and absolute, and it provided for termination only upon defendant's submission of written notice to that effect to plaintiff. Pursuant to a June 1981 public offering of its stock to raise capital, S.A.L. Communications, Inc. filed an amendment to its certificate of incorporation, changing its name to S.A.L. Cable Communications, Inc., and increasing the number of authorized shares. In September 1984, S.A.L. Cable Communications, Inc. filed another amendment to its certificate of incorporation and resumed use of its original name, S.A.L. Communications, Inc.

By July 1985, S.A.L. Communications, Inc. owed plaintiff $151,881.50 for goods received. Scheinman never terminated his guarantee in writing. After demand was made upon the corporate debtor and the individual guarantor, this action was commenced, in October 1985, against the individual guarantor only, the corporate debtor having filed for bankruptcy.

The complaint seeks judgment on the $151,881.50 owed plaintiff and attorneys' fees as provided by the terms of the guarantee. Defendant asserted a number of affirmative defenses at this point, none of which merit review here. In response to plaintiff's motion for summary judgment, defendant raised the arguments that the parties had orally agreed to revoke the guarantee once the corporation became publicly held and that, irrespective of any agreement to revoke, the guarantee did not apply to the debts of the new publicly held corporation, S.A.L. Cable Communications, Inc. Special Term, concerned about the effect going public had on the corporation, requested additional submissions on this issue. By order entered May 23, 1986, Special Term denied plaintiff's motion for

summary judgment. The court determined that issues of fact were raised by defendant's claim that the guarantee did not extend to the debts of a new corporate entity, the publicly held S.A.L. Cable Communications, Inc., the corporate structure of which had been altered.

Defendant has abandoned on appeal any argument that an oral agreement existed to relieve him of his obligations under the guarantee. This is understandable, given that it is well recognized that the terms of a guarantee, such as this one, requiring written notice of termination, cannot be modified by parol evidence or an asserted course of conduct. *(Chemical Bank v Sepler,* 60 NY2d 289, 293; *Chemical Bank v PIC Motors Corp.,* 87 AD2d 447, 450, *affd* 58 NY2d 1023.)

Rather, defendant's contention is that the changes in name and capital structure of the corporation, along with a change to a publicly held status, served to discharge his obligations under the guarantee as a matter of right, irrespective of the existence or not of any agreement to that effect with plaintiff, under the theory that a guarantee does not extend to bind the guarantor to satisfy the debts of a different entity. As this court has not had much occasion to determine under what circumstances alterations in the structure or formation of the principal-obligor release the guarantor from his obligations under the guarantee and this case squarely presents us with that issue, we take this opportunity to review general principles of suretyship and guarantee law in order to provide a framework for determining this issue.

A suretyship relation exists whenever a person becomes responsible for the debt of another. *(Anti-Hydro Co. v Castiglia,* 92 AD2d 741-742; *Duport v First Natl. Bank,* 262 App Div 267, 271, *revd* 288 NY 261.) A guarantee is distinguishable from other forms of surety contracts in that it is a separate, independent contract between the guarantor and the creditor-obligee and is collateral to the contractual obligation between the creditor-obligee and the principal-obligor. *(Kings County Sav. Bank v Fulton Sav. Bank,* 268 App Div 452, 454.)

Being a contract, a guarantee agreement is to be construed like other contracts so as to give effect to the parties' intentions. In particular, the obligations of the guarantor must be strictly construed according to the terms of the agreement and cannot be altered, extended or enlarged by the creditor or debtor without the guarantor's consent, since he cannot be held responsible to guarantee a performance different from

that which he intended or specified in the guarantee. *(Becker v Faber,* 280 NY 146, 148-150; *Richardson v County of Steuben,* 226 NY 13, 19; *People v Backus,* 117 NY 196, 201; *Page v Krekey,* 137 NY 307, 313-314.)

For example, when the guarantor has bound himself to satisfy an obligation of a specified debtor, he may not be held liable for the debt of another debtor, unless the contract clearly discloses such an intent. *(Bennel Co. v Simons,* 198 NYS2d 700, *affd* 12 AD2d 797.)

It is also argued that changes in the entity, the debts of which are guaranteed, which alter the composition, structure or form of the principal-obligor, can also serve to release the guarantor under the theory that such changes have the effect of creating a new obligation to which the guarantor never intended to become liable; that is, the changes create a new principal. Difficulties have arisen not in accepting the logic of this argument, but in determining when the changes are significant enough to justify releasing the guarantor of his obligations.

While New York courts have addressed this issue in a number of cases, there has not yet been developed any systematic method of determining the effect changes in the entity, the performance of which is guaranteed, have on the guarantor's obligation. The case law is useful, however, in emphasizing certain factors of which we must take note. At one extreme are those cases where the changes in the composition, structure or form of the principal-obligor are so minimal as not to affect the guarantor's obligation at all. In *People v Backus (supra),* for instance, the Court of Appeals upheld the liability of the guarantors with respect to a deposit of State funds in a national bank despite the fact that the existence of the bank, which had been due to terminate by operation of law, was extended through renewal of its charter pursuant to an amendment to the National Banking Act *(supra,* at pp 202-203). The court noted that all that had occurred was a mere prolongation of the same corporation and that the guarantors had entered into their contract with knowledge that the bank was subject to the banking laws, which could at any moment be amended *(supra,* at pp 203-204). The focus there was on the identity of the debtor.

In *Richardson v County of Steuben (supra),* the Court of Appeals determined that the guarantor, in specifically insuring the responsibility of the George W. Hallock Bank as a

continuing institution, was not released of that obligation when a change occurred in the membership of the partnership owning the bank *(supra,* at p 19). The court made mention of the fact that banking houses ordinarily continue their identity for generations and can only do so through a constant succession of partners *(supra,* at p 22). It distinguished other partnership cases where the surety undertook to obligate itself to the responsibilities of a particular partnership, which partnership dissolved upon the introduction of a new partner or the withdrawal of a partner, a change not contemplated by the guarantor *(supra,* at p 23). In *Richardson,* the primary focus of the court was on the intent of the parties, with regard to which the court took into account the common business customs of banking houses.

A more substantial change in the form of the business of the principal-obligor occurred in *New York Am. v Hub Adv. Agency* (136 Misc 596) when the principal-obligor, a partnership, incorporated itself after one of the partners executed a guarantee to ensure payment to plaintiff of all bills for advertising placed by the partnership. In nevertheless upholding the guarantor's liability, the court emphasized the following facts: the partner-guarantor participated in the decision to incorporate; he became a stockholder and director of the newly formed Hub Advertising Agency, Inc.; the board of directors of the corporation consisted of the members of the prior partnership; the guarantor never informed the plaintiff creditor of the change; and the business relation between plaintiff and the principal continued unaffected *(supra,* at p 597). The court concluded that the guarantor was "estopped from using the cloak of a corporate entity to which he himself was a party to relieve him of any liability under his written business agreement" *(supra,* at p 597). While not specifically stated, it is readily apparent that the basis for the court's decision was a determination that the identity of the corporation in terms of management, control, and business dealings had not been significantly altered by the change to corporate status.

At the other extreme are two cases, *Worth Corp. v Metropolitan Cas. Ins. Co.* (142 Misc 734) and *Anti-Hydro Co. v Castiglia (supra)* in which the facts were found to justify discharging the guarantors. When a corporation-principal merges into and becomes part of another corporation, the latter being the successor or possessor corporation which has completely retained its identity and structure, the liability of the guarantor

of the corporation-principal is discharged, since that original principal did not survive the merger as an independent entity and lost its identity. *(Worth Corp. v Metropolitan Cas. Ins. Co., supra,* at pp 736-737.) Characterizing the critical issue as a question of identity, the court found that defendant, who was not a director, officer or shareholder of the principal-corporation and did not participate in the merger, could not be said to have agreed to guarantee the performance of an entirely different corporation *(supra,* at pp 736-737; *accord, International Paper Co. v Grossman,* 541 F Supp 1236, 1241 [applying NY law]).

*Anti-Hydro Co. v Castiglia* (92 AD2d 741, *supra)* involved an attempt to bind the defendant, who had agreed to guarantee the debts of his sole proprietorship business, to the debts of a corporation which was involved in the same business and had a similar name, but was formed by his wife subsequent to the execution of the guarantee. Defendant was not an incorporator, director or stockholder of the corporation, but only a part-time manager. The court initially noted that because a sole proprietor is already personally liable for his business debts, the letter purporting to be a guarantee was not a valid guarantee in that it did not guarantee to pay the debts of another *(supra,* at p 742). However, even had the guarantee been valid, defendant could not be bound to answer for the debts of a totally different entity, a corporation formed by his wife in which he was not even a shareholder, director or officer. The court, finding that "a true change in the composition [and] structure of the enterprise" had taken place, concluded that defendant had not used "the cloak of the corporate entity to relieve himself of liability" *(supra,* at p 742). Again the critical issue was whether the identity of the principal-debtor had survived.

The major inquiry, therefore, has been to determine whether the changes in the entity, the debts or responsibilities of which are guaranteed, have the effect of creating a principal with a new identity and one the debts of which the guarantor never intended to guarantee when he executed the agreement. *(See, e.g., Worth Corp. v Metropolitan Cas. Ins. Co., supra,* at p 735.) In this regard, relevant factors include: changes in business name, form, composition, management, or ownership, the involvement of the guarantor in the business entity; and, whether the guarantor participated in the changes. These factors must be assessed on a case-by-case basis with due regard given to the guarantor's intent. Form,

however, is not to be exalted over substance, as exemplified in *New York Am. v Hub Adv. Agency (supra)* in which a change in the legal status of the business from a partnership to a corporation was held insufficient, because of the continuity of ownership, control and business dealings, to have created an entirely different principal-obligor.

However, an approach which focuses exclusively on whether or not the entity, the debts of which are guaranteed, has changed so significantly as to have created a different obligor is too narrow. It does not take into account that changes in the business format of a principal-obligor may, in addition to or instead of creating a new entity, materially alter the nature of the performance required of the guarantor so as to result in an attempt to bind the guarantor to an obligation or performance not contemplated by the guarantee.

Analyzing the effect of such changes on the guarantor's performance has become the critical issue in the decisions of various State and Federal courts. The test which has evolved is to determine whether the changes in the entity, the debts of which, are guaranteed significantly alter the business dealings between the debtor and the creditor and the nature of the guarantor's undertaking, in particular the degree of risk the guarantor is being obligated to assume. *(Bernardi Bros. v Great Lakes Distrib.,* 712 F2d 1205, 1207 [applying Ill law]; *Teledyne Mid-America Corp. v HOH Corp.,* 486 F2d 987, 990 [applying Hawaii law]; *Essex Intl. v Clamage,* 440 F2d 547, 550-551 [applying Ill law]; *United States Shoe Corp. v Hackett,* 793 F2d 161, 162-163 [applying Wis law]; *Alton Banking & Trust Co. v Sweeney,* 135 Ill App 3d 96, 481 NE2d 769, 773.) Application of this test has produced the results noted below.

In *Teledyne Mid-America Corp. v HOH Corp. (supra),* a married couple guaranteed the debts of a sole proprietorship run by the husband. Some time later the business was incorporated with new stockholders acquiring majority control of the business. Subsequently, the corporation merged into another corporation and the essential business nature of the enterprise changed. The court concluded that the entity had completely changed, and that concomitant with a dilution in the husband guarantor's control over the business was a significant increase in the nature of both guarantors' risks if the agreement were to be enforced. The *Teledyne* court refused to hold the guarantors liable, since the original principal-obligor no longer existed and the nature of the guarantors' liability had changed significantly *(supra,* at pp 990-991).

In *Alton Banking & Trust Co. v Sweeney (supra)* a change in the name and business of the principal-obligor from a used car dealership to a new car dealership, which was argued to have resulted in a bigger operation, was not a change which significantly altered the relation between the creditor and the principal, where credit was extended in the same manner as before. Nor did it alter the nature of the guarantors' liability, one of whom still operated the business and both of whom agreed to and participated in the changes *(supra,* at pp 773-774).

Likewise, in *Bernardi Bros. v Great Lakes Distrib. (supra),* the guarantor, who incorporated his business and changed its name, was still held liable on his guarantee for the corporation's debts, since the mere incorporation of his business did not alter the nature or dimensions of his business, the business relation between the principal and creditor, or the nature of the guarantor's risk *(supra,* at p 1208).

For the reasons which follow, we conclude that in the case at bar the changes put into motion and authorized by defendant himself did not result in creation of an entity different from the one the debts of which were guaranteed, nor did the changes significantly alter the business dealings between the corporation and the creditor or alter the risk assumed by defendant as guarantor. At issue here are a change in the corporate name, an expansion of the corporate capital through the sale of additionally authorized shares and a change in status from a close corporation, solely owned by the guarantor who served as its president, to a publicly owned corporation, of which the guarantor still retained majority control and continued to serve as president.

Clearly, a change in name, without a change in legal status or in the nature of the business, does not terminate the existence of a corporation and create a new one. *(Bernardi Bros. v Great Lakes Distrib.,* 712 F2d 1205, 1207, *supra; Department of Justice v Calspan Corp.,* 578 F2d 295, 300; *Alton Banking & Trust Co. v Sweeney,* 135 Ill App 3d 96, 481 NE2d 769, 773, *supra; Mountain States Tel. & Tel. v Lee,* 95 Idaho 134, 504 P2d 807, 808; *Worth Corp. v Metropolitan Cas. Ins. Co.,* 142 Misc 734, 735, *supra; Scovill Mfg. Co. v Cassidy,* 275 Ill 462, 114 NE 181, 186.) In fact, a guarantor entering into a contract guaranteeing performance by a corporation enters into it with knowledge that by statute a corporation is permitted to change its name *(supra,* at p 187; *see,* Business Corporation Law § 801 [b] [1]). Lastly, it scarcely needs noting

that contracts of guarantee would soon be rendered totally ineffective if a guarantor who is also the principal shareholder of the principal-obligor corporation could avoid liability merely by effecting a change in corporate name.

Nor does an increase in the capital of a corporation through the sale of additionally authorized stock alter the identity of a corporation. A corporation has the right to increase its capital stock or alter any provisions in its certificate of incorporation governing its capital, if it acts in compliance with the applicable statutes. *(Wagstaff v Holly Sugar Corp.,* 253 App Div 616, 623, *affd* 279 NY 625, *rearg denied* 279 NY 686; *Schramme v Cowin,* 205 App Div 20, 23; *see,* Business Corporation Law § 801 [b] [7].) Moreover, reorganizing or increasing the capital of a corporation is generally done with the intent of strengthening the financial status of a corporation, an objective which would actually favor the interests of a guarantor of the corporation.

The change from a closely held corporation to a publicly issued corporation with a greater number of shareholders, without changes in the business engaged in, also did not result in the creation of a new legal entity.* Except for instances not relevant here, a corporation is an entity endowed with a separate and distinct identity from that of its individual members or stockholders, and that identity remains unchanged and unaffected notwithstanding changes in the corporation's ownership or an increase in the number of owners. *(Rapid Tr. Subway Constr. Co. v City of New York,* 259 NY 472, 487; 13 NY Jur 2d, Business Relationships, § 25, at 286-287.) It is true that the case law and the Business Corporation Law do at times make distinctions between publicly issued and closely held corporations with regard to such matters as the formality of board meetings, the validity of certain shareholders' agreements concerning the management of the business, or the liability of the shareholders for the wages due its employees. *(See, Zion v Kurtz,* 50 NY2d 92, 102-103; *Matter of Lane [Abel-Bey],* 70 AD2d 838, 839; *Haff v Long Is. Fuel Corp.,* 233 App Div 117, 121; Business Corporation Law § 620 [c];

---

* The preferred definition among scholars of a closely held corporation, and that adopted by the Business Corporation Law, is one the shares of which are not traded on a national securities exchange or regularly quoted on an over-the-counter market by one or more members of a national or an affiliated securities association. *(See,* Business Corporation Law § 630 [a]; 1 O'Neal, Close Corporations § 1.02, at 2-3 [2d ed]; Kessler, New York Close Corporations § 1.01, at 1.)

§ 630 [a].) However, the fact that the debtor herein may now be required to act with more formality as a publicly issued corporation does not result in the creation of a new entity with a different identity.

The identity of the corporation having survived these changes, it still remains to be determined whether those changes materially affected the relationship between the principal-debtor and the creditor and the obligation undertaken by the guarantor, particularly the nature of the risk he assumed, so as to result in the creditor attempting to bind the guarantor to a performance beyond that contemplated in the guarantee. Finally, it must be determined whether the fact that defendant was wholly responsible for these changes estops him from claiming that they serve to discharge him from his obligations under the guarantee.

As a preliminary matter, it is important to note that this case does not involve a high-risk situation, such as a guarantee regarding bank loans, where the guarantee is being enforced with regard to a corporation with increased capital, one which can obtain credit far beyond that which would be extended to the predecessor corporation. In such a case, there would be a definite increase in the risk assumed by the guarantor. Rather, the creditor here is a supplier of merchandise to the debtor corporation, and the relation between the creditor and the debtor has remained unaltered despite the changes in corporate structure. The level of credit extended to the debtor has been modest. Interestingly, most of the capital raised incident to the public offering was utilized to purchase warehouse facilities, not to purchase additional goods from plaintiff.

Moreover, defendant guarantor, who remained as president of the corporation and the majority shareholder, still retained majority control of the corporate debtor's business activities, including its dealings with plaintiff. Thus, defendant continued to maintain control of the contract between plaintiff and the debtor and the level of risk he was assuming.

Most significant, however, is our conclusion that even had there been an increase in the risk to the guarantor, we would nevertheless conclude that defendant guarantor, in making a voluntary business decision which created the conditions causing the risk to increase and in failing to carry out the simple task of relieving himself of his obligations by providing written notice to plaintiff of his intent to terminate the guarantee,

implicitly consented to that increased risk. *(United States Shoe Corp. v Hackett,* 793 F2d 161, 163, *supra; Alton Banking & Trust Co. v Sweeney,* 135 Ill App 3d 96, 481 NE2d 769, 774, *supra; New York Am. v Hub Adv. Agency,* 136 Misc 596, 597, *supra.)*

The agreement not having been terminated, the corporation continued to request merchandise as usual and plaintiff continued to provide the merchandise on credit, relying on defendant's guarantee. In the face of clear language indicating the absolute and unconditional nature of the guarantee, defendant cannot escape liability by relying on changes he initiated for his benefit, which changes did not, in any case, have the effect of creating a new corporate entity or materially altering the relationship between the principal-debtor and the creditor or the obligations defendant freely chose to assume under the guarantee.

Accordingly, the order of the Supreme Court, New York County (Carmen Ciparick, J.), entered May 23, 1986, which denied plaintiff's motion for summary judgment, should be reversed, on the law, with costs, plaintiff's motion for summary judgment should be granted and the County Clerk directed to enter judgment in plaintiff's favor in the amount of $151,881.50, plus interest, costs and disbursements, and the matter of the amount of attorneys' fees for which defendant is liable under the guarantee agreement should be severed and remanded for determination.

MURPHY, P. J., KUPFERMAN, ROSS and KASSAL, JJ., concur.

Order, Supreme Court, New York County, entered on May 23, 1986, unanimously reversed, on the law, and plaintiff's motion for summary judgment granted. Appellant shall recover of respondent $75 costs and disbursements of this appeal, and the County Clerk is directed to enter judgment in favor of plaintiff-appellant in the amount of $151,881.50, plus interest, costs and disbursements, and the matter of the amount of attorneys' fees for which defendant is liable under the guarantee agreement is severed and remanded for determination.