OPINION OF THE COURT
Ira B. Harkavy, J.
*501 Defendant third-party plaintiff the Insurance Company of the State of Pennsylvania (ICP) moves for an order, pursuant to CPLR 3211 and 3212, summarily dismissing plaintiff 95 Lorimer, LLC’s (Lorimer) amended complaint and separate causes of action on the ground, inter alia, that the action is time-barred and/or the complaint fails to state a cause of action. Lorimer cross-moves for an order precluding ICP’s examination before trial of plaintiff in this action based upon ICP’s alleged failure to comply with a prior discovery order of this court.
Factual Background
On or about July 10, 1998, Lorimer and Iroquois Demolition Corporation, also known as Iroquois Wrecking Corp. (Iroquois), entered into a written agreement (the contract) wherein Iroquois agreed to perform certain demolition and removal work at a property located at 95-107 Lorimer Street in Kings County and owned by Lorimer.
On or about July 13, 1998, ICP (as surety) issued a payment and performance bond on the contract on behalf of Iroquois (as contractor, principal and obligor) to Lorimer (as owner and obligee). The bond was executed on behalf of Iroquois by its vice-president, third-party defendant Charles Walker. The bond contains a limitations period requiring that any suit seeking recovery thereunder be commenced within two years after the contractor/obligor ceases to perform under the contract.
Commencing on or about May 26, 1998, and continuing at the time it entered into the subject contract and performance bond, Iroquois was an entity incorporated by and under the laws of the State of New York, pursuant to a certificate of incorporation duly filed by Iroquois with the Secretary of State.
It is undisputed that Iroquois performed under the subject contract and received payment from Lorimer for said performance up to and until June 18, 1999.
Lorimer asserts that, sometime between June 18 and August 4, 1999, Philip Schwab, known by Lorimer to be an owner and principal of Iroquois, informed Lorimer that Iroquois had changed its name to Irondequoit Corporation (the third-party defendant, hereinafter Irondequoit) and that all payments under *502 the contract, formerly made by Lorimer to Iroquois, were now to be issued to Irondequoit.[1]
There is absolutely no indication on the record, and Lorimer does not allege, that the surety, ICP was either informed of the purported “name change” or notified that payment under the subject contract would now be issued by Lorimer to Irondequoit, rather than Iroquois. Equally apparent from the record is the fact that Lorimer did not then seek ICP’s permission to change the obligor on the bond from Iroquois to Irondequoit. Nevertheless, Lorimer, starting on August 4, 1999, began making all payments under the contract to Irondequoit, and not to Iroquois.
At the time Lorimer issued this first, August 4, 1999, payment to Irondequoit, Irondequoit had not yet achieved official status as a corporate entity. Irondequoit did, on November 19, 1999, file incorporation papers with the New York Secretary of State. At the time of said incorporation by Irondequoit, Iroquois was still a separately incorporated business entity in the State of New York.[2]
Eventually, a dispute arose between Lorimer and Irondequoit concerning Irondequoit’s performance, or lack thereof, under the contract. Specifically, Lorimer alleges that, during the demolition and excavation of the subject property, Iroquois and/or Irondequoit buried debris at the premises, resulting in a dangerous sinkhole situation which Irondequoit thereafter failed or refused to correct.
It further appears from the record that Lorimer accelerated the contract payments, first to Iroquois, then to Irondequoit; issued the last contract payment to Irondequoit on April 27, 2001; and payed or issued the full contract price to those two entities prior to the completion of all of the work and, more specifically, although much or all of the excavation work had allegedly not been performed.
Lorimer did not notify ICP of the change in the corporate recipient of payments under the subject contract until December 2001, more than two years after Lorimer made its last payment *503 to Iroquois and sometime after Irondequoit apparently refused to perform the requested excavation work unless it received additional payment.
By correspondence dated December 12, 2001, Lorimer notified ICP that payment of the contract had been rendered in full by Lorimer upon the contractor’s completion of the demolition work; that the contractor had failed and refused to complete the excavation; and that Lorimer was considering declaring a contractor default under the bond. A second correspondence of the same date from Lorimer to ICP included the aforementioned undated correspondence to Lorimer from Mr. Scott, Irondequoit’s vice-president, agreeing that payments to Irondequoit were to be credited to the original amount of the contract entered into by Iroquois.
Thereafter, on December 17, 2001, ICP responded in two letters wherein it, in essence, refused its consent to a change in the bond obligor from Iroquois to Irondequoit, noting, inter alia, that ICP “never consented or authorized [Lorimer] to release payments under the[ ] contract to any firm other than the bonded contractor, Iroquois”; Lorimer may have prejudiced ICP’s rights “by releasing 100% of the contract funds to two different entities,” even though the project had not yet been completed; and Lorimer had issued payments to Irondequoit at its own peril.
Irondequoit was eventually declared in default by Lorimer; ICP refused to honor the bond; and the instant action ensued.
Procedural History
Lorimer commenced the main or underlying action in or about May 2002, and the third-party action was commenced by ICP in or about November 2002. Lorimer thereafter served and filed an amended complaint wherein it enlarges the monetary damages sought.
Discovery in the main action has commenced and proceeded, albeit, haltingly; discovery material has been exchanged, but depositions are outstanding. As to the third-party action, ICP asserts that it has been hindered or unable to proceed with its prosecution of that action due to its inability to locate third-party defendant Charles Walker (Iroquois’ vice-president and individual bond guarantor), and because Iroquois has vacated its corporate premises and closed its operations. The record reveals that Iroquois was dissolved on June 26, 2002 by *504 proclamation of the Secretary of State and pursuant to the Tax Law, for nonpayment of taxes.[3]
A prior motion by ICP seeking the dismissal of the main action on limitations grounds was denied by the court in November 2003, with leave to renew upon the completion of discovery which, at that time, was scheduled to be completed by January 31, 2004.
The Instant Motion
ICP citing, inter alia, the expiration of the two-year contractual limitations period, again moves for summary dismissal of the complaint, pursuant to CPLR 3211 and/or 3212. ICP argues that Iroquois, the original bond obligor and contractor on the project, is a separate and distinct corporate entity from Irondequoit and, because Iroquois last performed and received payment under the contract in June 1999, plaintiffs instant action, which was commenced more than two years later, in May 2002, is time-barred and must be dismissed.
Lorimer opposes the motion, contending that Iroquois and Irondequoit are the same entity; that the change was in name and location only, while the principals, employees and work functions remained the same; and that the action is, therefore, timely and should be allowed to proceed. Lorimer also cross-moves for an order precluding defendant’s conduct of an examination before trial of Lorimer, based upon defendant’s alleged failure to comply with a prior discovery order of this court.
The court, despite its prior order and having conducted a further review of the record of this matter, finds the record sufficiently clear and uncontradicted on the controlling factual and legal issues and does not find that any additional discovery by or from the parties will be of material assistance in resolving the particular threshold issue of whether this action is time-barred. The court, therefore, considers defendant’s renewed motion as being properly before it and determines said motion and plaintiffs cross motion as follows:
Discussion
“A guarantee agreement is to be construed like other contracts in order to give effect to the parties’ *505 intentions ... ‘In particular, the obligations of the guarantor must be strictly construed according to the terms of the agreement and cannot be altered, extended or enlarged by the creditor or debtor without the guarantor’s consent, since he cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty’ ” (Caldor, Inc. v Mattel, Inc., 817 F Supp 408, 410-411 [1993], quoting Fehr Bros, v Scheinman, 121 AD2d 13, 15-16 [1986]).
Mere formalistic changes in the identity of a principal obligor, such as its name or location, do not discharge the surety (see State of New York v International Fid. Ins. Co., 152 AD2d 77, 80 [1989]). However, “a guaranty does not extend to a subsequent entity if there has been a true change in the composition or structure of the enterprise” (Anti-Hydro Co. v Castiglia, 92 AD2d 741, 742 [1983]).
As to the instant matter, the question is purely one of identity (Worth Corp. v Metropolitan Cas. Ins. Co. of N.Y., 142 Misc 734, 735 [1932]) and the record is clear and uncontradicted that the entities known as Iroquois and Irondequoit, even if allegedly operating within the same corporate structure and guided by the same principals or shareholders and a single corporate consciousness, were, at all times pertinent, differently identified, and separately incorporated under the laws of the State of New York.
Thus, rather than there being a mere prolongation or extension of the existence of the same corporation (Iroquois), a new corporation and a separate legal entity (Irondequoit) was formed as a matter of law and the change in the identity of the contractor/obligor, that which plaintiff ultimately declared in default, was not merely formalistic (see Mars Novelty Corp. v Sunrise Mall Assoc., 181 AD2d 661 [1992] [lease agreement as to original corporate entity was not, following first entity’s dissolution, extended to subsequently incorporated entity with same name, principal and business; original corporation’s dissolution was improper and entities were legally separate and distinct]; compare People v Backus, 117 NY 196 [1889] [liability of guarantors of a deposit of state funds in a national bank continued after the extension of the corporate existence of the bank by renewal of its charter]).
The situation here is unlike that encountered in State or any of the other cases relied upon by plaintiff since, as to the instant *506 matter, although the business activities pertinent to the guaranty of payment apparently remained the same, the companies performing those activities were at all times two separately incorporated and, thus, separate and distinct, legal entities (Mars Novelty Corp., 181 AD2d at 663). As a result, the company which defaulted and whose debt defendant is now being called upon to pay is not the same legal entity (1) in connection with whose work the bond was originally issued; (2) that served as principal obligor on the bond; or (3) whose debts were guaranteed by defendant.
“[W]hen the guarantor has bound himself to satisfy an obligation of a specified debtor, he may not be held liable for the debt of another debtor, unless the contract clearly discloses such an intent” (Fehr, 121 AD2d at 16, citing Bennel Co. v Simons, 198 NYS2d 700 [I960]). Here, the identity of the principal debtor did not survive in the manner urged by plaintiff, and defendant cannot be bound to answer for the debts of a totally different entity, made so by virtue of its separate and subsequent incorporation (see Anti-Hydro, 92 AD2d at 742).
In addition to the certificates of incorporation, which make clear that Iroquois and Irondequoit were two separately incorporated and legally coexisting entities,[4] nothing in the record indicates that Iroquois ever either discarded or exchanged its corporate name and existence during the term of the contract and prior to the default. Plaintiff, in fact, presents absolutely no proof, other than what amounts to inadmissible hearsay evidence, of what it alleges was a mere name change by Iroquois. As correctly noted by movant, all that is required to effectuate a corporate name change is a simple amendment of the entity’s certificate of incorporation pursuant to Business Corporation Law § 801 (b) (1). A certificate of incorporation is a public record and, even if the companies appeared to have the same principals and to conduct the same work activities, Lorimer could and should have easily ascertained that the purported “name change” was not a change in name only, and a separate entity had been formed which was not the legal equivalent of the original bond obligor.
*507 By taking the alleged oral assertion of a name change at face value, and issuing contract payments according to that oral assertion, plaintiff allowed Irondequoit to work on the construction project without benefit of a performance bond and proceeded with the project and paid Irondequoit at plaintiffs own peril.
Plaintiffs argument that defendant, pursuant to paragraph 8 of the contract, waived notice of a name change is unavailing, since the court, again, does not find that there was a mere name change and prolongation of the existence of the same corporation, but that a new corporation and separate legal entity was formed.
To the extent plaintiff argues that Irondequoit was Iroquois’ successor contractor on the project and a matter of which defendant waived notice of under the bond agreements, “[w]here possible, a contract should be interpreted to avoid inconsistencies and to give meaning to all of its provisions, giving a practical and reasonable interpretation to the language employed and the parties’ reasonable expectations with respect thereto” (Malleolo v Malleolo, 287 AD2d 603, 603-604 [2001]). Upon its thorough review of the subject bond agreements, the court finds no provision thereof which may be reasonably interpreted as contemplative of the particular waiver sought to be advanced by plaintiff. Nor may it be fairly said that the full assumption of the original bond obligor’s contractual duties and payments by a separately incorporated legal entity was reasonably within the contemplation of the defendant surety when the guaranty was issued (compare Aetna Cas. & Sur. Co. v New York City School Constr. Auth., 1997 WL 272404,*3, 1997 US Dist LEXIS 7145, *8-9 [SD NY, May 21, 1997] [surety agreed in advance, by virtue of bond provision, that any transfer or assignment of any work to be performed by principal obligor would be treated as if performed, or not performed, by principal obligor]).
Plaintiff, in light of and in response to movant’s evidence of the separate certificates of incorporation, and that Iroquois, the original obligor, was not dissolved until June 2002 (i.e., three years after it last received any payment with respect to the subject construction project), fails to present any documentary proof, or anything other than “mere conclusions, expressions of hope or unsubstantiated allegations or assertions” (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]), of a merger or acquisition agreement between Iroquois and Irondequoit; that Irondequoit was Iroquois’ assignee; or, as indicated by the fact *508 that Iroquois was neither voluntarily dissolved by its principals and/or shareholders nor, apparently, dissolved as soon as practically and legally possible, that Irondequoit was Iroquois’ de facto successor.[5]
The court further finds that defendant has presented evidence in the form of the sworn affidavit of the president of its authorized claim representative that the change in corporate legal entities was significant and prejudicial and increased defendant’s risk of liability under the bond in that it was done outside of defendant’s knowledge and permission; defendant was not granted any opportunity to conduct a credit or other check on the newly formed corporate legal entity known as Irondequoit, or to obtain a personal guaranty from any of its principals;[6] and, given the fact that Iroquois ceased business operations and was eventually dissolved for tax-related delinquencies, that Irondequoit was purportedly engaged in the same business as Iroquois and being run by the same principals, and that some of these same principals may have, even after the cessation of Iroquois’ business operations, continued to be legally responsible for Iroquois’ tax liabilities along with their added liability for the newly formed company, defendant surety was apparently being asked to assume an entirely different and possibly enhanced legal risk for which it never intended to become liable.[7]
Finally, “[a]lthough ‘mere formalistic changes in the identity of a principal obligor do not discharge the surety’ [State, 152 *509 AD2d at 80], ... in certain circumstances, a substantial alteration of an underlying contract without notice or consent of a surety will act to discharge the obligations of that guarantor” (Aetna, 1997 WL 272404, * 2, 1997 US Dist LEXIS 7145, *8).
Here, there was a material and substantial alteration of the underlying contract since, not only was a new and legally distinct entity allowed to take over the original obligor’s full work performance and other contractual responsibilities, it appears that the creditor and principal debtor, plaintiff and Iroquois and/or Irondequoit, acted unilaterally to augment defendant surety’s liability by accelerating the contract payments and extending and accepting payment in full prior to the completion of a substantial portion of the work. In sum, plaintiff and Irondequoit substituted a new contract, to which defendant never agreed, for the original, thus, releasing defendant from the guaranty (Bier Pension Plan Trust v Estate of Schneierson, 74 NY2d 312, 315 [1989]; Central Fed. Sav. & Loan Assn, v Pergolis, 173 AD2d 587, 589 [1991]; see also Becker v Faber, 280 NY 146, 148-149 [1939]; Mangold v Keip, 177 Misc 2d 953, 954 [1998]; Midland Steel Warehouse Corp. v Godinger Silver Art, 276 AD2d 341, 343-344 [2000]; Congregation Ohavei Shalom v Comyns Bros., 123 AD2d 656 [1986]).
The court has considered plaintiffs remaining arguments and rejected them as being without merit.
Conclusion
Based upon the foregoing, ICP’s motion for summary dismissal of the action is granted on contractual limitations grounds, and the complaint hereby dismissed in its entirety.
Plaintiffs cross motion to preclude is denied as moot.

. An undated correspondence to Lorimer from Tom Scott, Irondequoit’s vice-president, fails to confirm the purported name change and asserts only that funds paid Irondequoit by Lorimer “are to be credited to the original contract payments of Iroquois Corp.’s original contract amount.”

. In connection with its May 1998 incorporation, Iroquois listed its principal location with the Secretary of State as 37-61 39th Street, in Long Island City; Irondequoit, upon its November 1999 incorporation, listed its principal location as 115 Kent Avenue, in Kings County.

. Iroquois’ official dissolution occurred just after the commencement of the first-party action and several months prior to commencement of the third-party action.

. The herein analysis is not effected by the fact that plaintiff made five payments to Irondequoit (from Aug. 4, 1999 to Nov. 4, 1999) prior to Irondequoit being officially incorporated in the State of New York. Even if these payments could somehow be credited to the corporate entity still then existing and known as Iroquois, the fifth, November 4, 1999, payment nevertheless occurred more than two years prior to plaintiffs commencement of the instant action.

. Unless waived, a surety is, in any event, not bound for a default of a successor corporation into which the principal obligor is merged or with which it is consolidated, because the identity of the obligor is then lost (see generally Worth, 142 Misc at 735-736; see also International Paper Co. v Grossman, 541 F Supp 1236, 1240-1241 [1982] [applying New York law]).

. Mr. Scott was Irondequoit’s vice-president. Iroquois’ vice-president, Charles Walker, the personal guarantor on the bond, is not said to have also been an Irondequoit principal.

. The record does not reveal when Iroquois first failed or neglected to meet its tax obligations, only that it may have ceased business in June 1999. The court notes, in passing, that, while it is unknown whether the formation of the new company by the same principals was in any manner inspired by Iroquois’ tax difficulties, once payment under the contract was transferred from Iroquois to Irondequoit, such funds would not appear to be available to Iroquois to meet its tax liabilities. It is further noted that, where an existing corporation is dissolved for failure to pay taxes and/or file tax returns, Tax Law § 203-a prohibits anyone else from incorporating under the same or similar name for a period of three months. Here, Irondequoit engaged in the same business as Iroquois and was incorporated by the same or similar principals approximately four months after Iroquois allegedly ceased doing business, but more than two years prior to its dissolution.