93 F.3d 1064
 The CHASE MANHATTAN BANK, N.A., Plaintiff-Appellant-Cross-Appellee,
v.
AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as
maker, not personally, but as Trustee under Trust Agreement
dated January 20, 1988 and known as Trust No. 104455-00;
Samuel Zell, in his individual capacity and as Trustee of
Samuel Zell Revocable Trust; and B. Ann Lurie, as executrix
of the Estate of Robert Lurie and as Trustee of the Robert
Lurie Revocable Trust, Defendants-Appellees-Cross-Appellants.
 Nos. 1762, 1989, Dockets 95-7707(L), 95-9297(AXP).
 United States Court of Appeals,
Second Circuit.
 Argued June 26, 1996.
Decided Aug. 27, 1996.
 
 Andrew R. Kosloff, New York City (Kent T. Stauffer, Chase Manhattan Bank, New York City, on the brief), for Plaintiff-Appellant-Cross-Appellee.
 Stephen Novack, Chicago, IL (Donald Tarkington, Novack & Macey, Chicago, IL, Raymond T. Munsell, Windels, Marx, Davies & Ives, New York City, on the brief), for Defendants-Appellees-Cross-Appellants.
 Before: MINER, JACOBS and PARKER, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 Plaintiff Chase Manhattan Bank ("Chase") extended a loan for the financing of improvements to real property, and accepted as security a mortgage on the property and the defendants' personal guaranty that, in the event of default and foreclosure, they would pay to Chase the costs "incurred or to be incurred" by Chase in completing the improvements, or "such" costs "as estimated by the Construction Consultant." When the developers stopped work and defaulted on the loans, Chase obtained an estimate of completion costs from the Construction Consultant, unsuccessfully demanded payment under the guaranty, took possession in a friendly foreclosure proceeding, and sold the property--without making any improvements--for an amount insufficient to satisfy the loans.
 
 
 2
 Chase commenced a diversity action in the United States District Court for the Southern District of New York (Baer, Jr., J.), seeking more than $4 million in damages for the alleged breach of the guaranty agreement. After the parties filed cross-motions for summary judgment, the district court ruled first that Chase's claim for completion costs estimated by the Construction Consultant is a claim for liquidated damages that is unsustainable under New York law, and then dismissed Chase's complaint on the ground that, in the absence of evidence that Chase incurred any improvement costs or that the unimproved state of the property reduced the sale price, Chase suffered no damages and therefore failed to satisfy the $50,000 amount in controversy requirement for diversity jurisdiction. See 28 U.S.C. § 1332(a); Fed.R.Civ.P. 12(h)(3).
 
 
 3
 Everyone appeals. Chase argues that the district court had diversity jurisdiction because the amended complaint pleaded sufficient facts to establish that, at the time the complaint was filed, Chase had a good faith belief that its claim exceeded $50,000. The defendants agree that there is jurisdiction, but contend that the district court--having properly concluded that the guaranty covers only costs that Chase has incurred (or will be required to incur) and that Chase has incurred (and will incur) no such costs--should have dismissed the complaint on the merits.
 
 
 4
 We agree with all parties that there is diversity jurisdiction, and we agree with the defendants that the undisputed facts defeat the claim. We therefore vacate the dismissal of the complaint for lack of subject matter jurisdiction, and remand to the district court with instructions to enter summary judgment in favor of the defendants.
 
 BACKGROUND
 
 5
 Defendants Samuel Zell and the late Robert Lurie,[1] both successful real estate developers, formed Morton Grove Investors Limited Partnership ("Morton Grove") in late 1987 for the purpose of acquiring and developing an office complex located in Morton Grove, Illinois.[2] The office complex, which was situated on 28.8 acres and which was formerly the corporate headquarters of a large pharmaceutical company, consisted of a 300,000 square-foot office building and a warehouse, built in 1948. In January 1988, the office complex was purchased by defendant American National Bank and Trust Company of Chicago ("ANB"), which was acting as trustee of a land trust. Morton Grove was the land trust's sole beneficiary. Chase loaned $15.7 million to ANB to finance the purchase of the office complex, and ANB executed a mortgage on the property in favor of Chase.
 
 
 6
 On April 11, 1989, Chase, ANB and Morton Grove entered into an agreement in which Chase agreed to loan $6 million to ANB (still acting as trustee for the land trust) to finance certain renovations to the office building (the "Loan Agreement"). Chase secured that loan with a second mortgage on the office complex. To further protect the collateral, and to ensure that the loan proceeds would be used to enhance the marketability of the office complex, the Loan Agreement required Morton Grove to make certain renovations and improvements to the office building, including the replacement of the entire exterior of the building and of the system for heating, ventilation and air conditioning (the "Improvements"). The purpose of the Improvements was to prepare the property for ultimate rental as offices and facilities for research and development either as a single space for a single tenant or as twelve or fewer units suitable for multiple tenancies.
 
 
 7
 The Loan Agreement contemplated that the proceeds would be disbursed in monthly installments only as costs were incurred in connection with the specified improvements. At the time that the Loan Agreement was executed, no such costs had been incurred by Morton Grove or by ANB. In an amendment to the Loan Agreement, Chase expressly waived the provisions that tied the loan disbursements to the incurring of costs. Ultimately, Chase disbursed approximately $5.125 million to finance the Improvements.
 
 
 8
 Concurrent with the Loan Agreement, Zell and Lurie executed a document designated "Completion Costs Guaranty" in the form of a letter from them to Chase (the "Guaranty"). Pursuant to the Guaranty, Zell and Lurie agreed, in the event of default under the Loan Agreement, to reimburse costs incurred or to be incurred by Chase for the completion of Improvements to the extent that those costs exceeded the undisbursed portion of the loan. At Chase's option, that amount could be based on costs "actually incurred" or on a binding estimate rendered by the Construction Consultant as to the amount of such costs "required to be incurred" to complete the Improvements. The relevant text is set out in the margin.[3]
 
 
 9
 Chase alleges that, sometime after executing the Guaranty and the Loan Agreement, Zell and Lurie transferred their assets to, respectively, the Samuel Zell Revocable Trust and the Robert Lurie Revocable Trust (the "Revocable Trusts"), each naming himself as trustee of the trust bearing his name. Chase contends that on August 31, 1990, the Revocable Trusts agreed to share responsibility for all guarantees and agreements entered into by Zell and Lurie, including the Completion Costs Guaranty. Thus, Chase alleges that Zell, Lurie and the Revocable Trusts were joint signatories to the Guaranty from August 31, 1990 forward.
 
 
 10
 Between 1989 and early 1990, Morton Grove made some of the Improvements to the office building, but all work stopped in the summer of 1990. Whether Morton Grove completed all the Improvements remains disputed. ANB stopped making payments on the two loans as of May 1, 1991, and then defaulted under the Loan Agreement. In August 1991, ANB tendered the deed to Chase, which Chase refused. There is no evidence in the record that Chase took any further action until late 1992, when it instructed Eckland Consulting, the construction consultant designated by the Guaranty and the Loan Agreement, to estimate the cost of completing the Improvements. Eckland submitted its report to Chase in November 1992, estimating that the completion of the Improvements would cost $3,558,540 for a single space for occupancy by one tenant, or $4,519,180 for twelve units. On December 4, 1992, Chase forwarded a copy of that report to Zell accompanied by a letter demanding payment of $4,519,180. Zell made no response.[4]
 
 
 11
 In January 1993, Chase commenced friendly foreclosure proceedings against the property. However, Chase alleges that by the time it took title on June 9, 1993, the market for suburban office buildings in Illinois had collapsed. On July 9, 1993, Chase entered into an agreement to sell the property for $2.685 million for use as a warehouse. That deal closed on or around July 14, 1993. During the one month that Chase actually held title to the office complex, Chase made no Improvements to the property. Under the terms of the sale, Chase undertook no obligation (and has no obligation) to make any Improvements to the property.
 
 
 12
 Chase originally commenced this action for breach of the Guaranty in May 1992. Chase's amended complaint (dated April 9, 1993 but filed on May 4, 1993) alleges that Zell, Lurie and the Revocable Trusts guaranteed the costs of completing the Improvements, that the Improvements were unfinished, that the estimated completion costs exceed $4 million, and that Chase is entitled to recover at least $4 million from the defendants for breach of the Guaranty.[5] Jurisdiction was based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). In May 1995, Chase and the defendants moved for summary judgment. In a memorandum and order dated June 22, 1995, Judge Baer sua sponte dismissed Chase's complaint for failing to meet the $50,000 amount in controversy requirement necessary for diversity jurisdiction. The district court made no ruling on the parties' motions for summary judgment. In a memorandum and order dated November 27, 1995, the district court denied Chase's motion to reconsider.
 
 DISCUSSION
 
 13
 All parties appeal the district court's decision to dismiss Chase's complaint for lack of subject matter jurisdiction. In addition, the defendants contend that, because Chase incurred and will incur no reimbursable costs in connection with completion of the Improvements, no open question of material fact bars entry of summary judgment in favor of the defendants. We separately address the parties' contentions.
 
 
 14
 A. Subject Matter Jurisdiction.
 
 
 15
 In dismissing the amended complaint, the district court concluded that neither of Chase's theories of damages could support a $50,000 damage award, because Chase suffered no compensable damages at all. As to actual damages, the court noted Chase's concession that it incurred and will incur no costs in connection with the Improvements, and made the finding that in the depressed regional real estate market of July 1993, "regardless of any renovations that could have been performed, Chase would not have received a higher sales price for the property." As to liquidated damages, the district court concluded that the Guaranty contains no enforceable liquidated damages clause. The court therefore dismissed Chase's complaint:
 
 
 16
 Because the plaintiff suffered no actual damages, it appears to a legal certainty that the jurisdictional amount required for subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a) ($50,000), cannot be satisfied. Thus, this case is dismissed for want of subject matter jurisdiction pursuant to Rule 12(h)(3).
 
 
 17
 We review de novo a district court's legal conclusion with respect to subject matter jurisdiction. In re Vogel Van & Storage, Inc., 59 F.3d 9, 11 (2d Cir.1995). A district court has subject matter jurisdiction based on diversity of citizenship if the suit is between citizens of different states and "the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs." 28 U.S.C. § 1332(a). The complaint duly alleges (and it is not disputed) that Chase's principal place of business is New York, and that the defendants are citizens of Illinois. As to the second requirement, "[a] party invoking the jurisdiction of the federal court has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." Tongkook America, Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir.1994).
 
 
 18
 "The amount in controversy is determined at the time the action is commenced." Id.; see also Coventry Sewage Assocs. v. Dworkin Realty Co., 71 F.3d 1, 4 (1st Cir.1995) (in determining amount in controversy, the courts "look[ ] to the circumstances at the time the complaint is filed"). It is well settled that
 
 
 19
 the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.
 
 
 20
 St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (emphasis added and footnotes omitted); see also Horton v. Liberty Mut. Ins. Co., 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961) (amount in controversy is determined "from the complaint itself, unless it appears or is in some way shown that the amount stated in the complaint is not claimed in good faith" (internal quotation marks omitted)). A plaintiff's good faith belief as of the filing date may be ascertained by reference to the pleadings and any facts on that subject adduced in discovery:
 
 
 21
 [I]f, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed[,] or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.
 
 
 22
 St. Paul Mercury, 303 U.S. at 289, 58 S.Ct. at 590 (footnote omitted). We have held that "the legal impossibility of recovery must be so certain as virtually to negat[e] the plaintiff's good faith in asserting the claim. If the right of recovery is uncertain, the doubt should be resolved ... in favor of the subjective good faith of the plaintiff." Tongkook, 14 F.3d at 785-86 (quoting McDonald v. Patton, 240 F.2d 424, 426 (4th Cir.1957)). In any event, before determining that the amount in controversy requirement has not been met, "the court must afford the plaintiff an 'appropriate and reasonable opportunity to show good faith in believing that a recovery in excess of [the jurisdictional amount] is reasonably possible.' " A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 88 (2d Cir.1991) (quoting Arnold v. Troccoli, 344 F.2d 842, 846 (2d Cir.1965)).
 
 
 23
 The amended complaint was filed on May 4, 1993. At that time, Chase had commenced foreclosure proceedings against the office complex, but had not yet won title. According to the complaint, "[c]ertain of the Improvements to the Property required to be made under the Building Loan Agreement and guaranteed by the Completion [Costs] [G]uaranty have not been made. Consequently, Chase is entitled to collect from defendants Samuel Zell, B. Ann Lurie ..., The Samuel Zell Revocable Trust and the Robert Lurie Revocable Trust the direct and indirect costs of completing such Improvements in accordance with the Completion Guaranty." The complaint further alleges that the cost of completing the Improvements "exceed[s] $4,000,000."
 
 
 24
 Chase concedes that at the time that the amended complaint was filed, Chase had incurred no costs in connection with the Improvements. But recovery under the Guaranty did not depend on whether Chase had already incurred costs, because the Guaranty requires reimbursement for all "Direct and Indirect Costs incurred, or estimated by the Construction Consultant to be required to be incurred, as the case may be, in order to complete the Improvements...." (Emphasis added.) Eckland Consulting estimated those costs at more than $4 million. It remained possible, at the time that the complaint was filed, that Chase would complete the Improvements at some point in the future, or would undertake to pay for Improvements made by a tenant or a buyer. Indeed, the defendants concede that they would have been liable if Chase actually had expended (or been required to spend) any sum in connection with the Improvements. Accordingly, at the time the complaint was filed, Chase had a viable cause of action for an amount that exceeded the jurisdictional threshold. Moreover, Chase has argued in evident good faith that the Guaranty creates liability (for more than $4 million) regardless of whether Chase expended any sums or expected to do so. This argument fails, see supra at 1073-1075, but based on Chase's allegations and the undisputed facts that have come to light in discovery, we cannot say that the legal impossibility of recovery on Chase's complaint at the time it was filed was "so certain as virtually to negat[e] the plaintiff's good faith in asserting the claim." Tongkook, 14 F.3d at 785 (quoting McDonald, 240 F.2d at 426). Dismissal for lack of subject matter jurisdiction was therefore unwarranted because it was not "apparent, to a legal certainty," that Chase could not recover the amount claimed. St. Paul Mercury, 303 U.S. at 289, 58 S.Ct. at 590; see also Horton, 367 U.S. at 353, 81 S.Ct. at 1573; Tongkook, 14 F.3d at 784.
 
 
 25
 The district court noted the concession by Chase that "it neither incurred expenses related to making the renovations prior to the sale of the property ..., nor is obligated to pay for, nor make, any such improvements now that the property has been sold." But those circumstances could not come to pass or be known until the property was sold in July 1993, 14 months after the filing of the original complaint and three months after the amendment. Evidence concerning events that post-date the filing of a complaint is relevant only to the extent that it casts light on whether recovery was never legally possible or whether a plaintiff had a good faith belief, at the time the complaint was filed, that the jurisdictional requirement was met. See St. Paul Mercury, 303 U.S. at 290, 58 S.Ct. at 591 (court may assess plaintiff's good faith belief from facts adduced at trial); Tongkook, 14 F.3d at 786 (good faith may be assessed from facts adduced in pre-trial discovery). But the fact that Chase ultimately incurred no costs does not bear upon Chase's good faith belief on May 5, 1993, that it had a $4 million claim against the defendants for costs it might incur or be required to incur. And "once jurisdiction attaches, it is not ousted by a subsequent change of events," even if that subsequent change in events renders recovery impossible. Coventry, 71 F.3d at 7; see also St. Paul Mercury, 303 U.S. at 289-90, 58 S.Ct. at 590-91 ("Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction."). The district court thus confused the jurisdictional inquiry with the ultimate issue of recovery. See Ochoa v. Interbrew Am., Inc., 999 F.2d 626, 630 (2d Cir.1993) (courts must "refrain from adjudicating the merits of the case" in determining whether jurisdiction exists).
 
 
 26
 Because the amended complaint satisfied the amount in controversy requirement, we reverse the ruling that diversity jurisdiction is lacking.
 
 
 27
 B. Summary Judgment.
 
 
 28
 On appeal, the defendants contend that they are entitled to summary judgment because the district court correctly ruled that Chase "suffered no actual damages," and because Chase concedes that it has never incurred and will never incur costs related to the completion of the Improvements. The district court made no ruling on either motion for summary judgment. However, we need not remand to the district court for a ruling on the parties' summary judgment motions in order to resolve this case. "An appellate court has the power to decide cases on appeal if the facts in the record adequately support the proper result," Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 850 (2d Cir.1992), or "if the record as a whole presents no genuine issue as to any material fact." King v. Commissioner, 458 F.2d 245, 249 (6th Cir.1972); see also 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2577, at 522-26 (2d ed. 1994) ("The appellate court will determine the appeal without more if ... the only contentions raised by the parties on appeal do not turn on findings of fact."). Thus, if we find that a party must prevail as a matter of law, a remand is unnecessary.
 
 
 29
 The defendants make the preliminary argument, which we address first, that Chase waived its appellate arguments by failing to raise them in district court.
 
 
 30
 1. Waiver.
 
 
 31
 Chase contends on appeal that it is entitled to damages because the Guaranty obligates the defendants to pay Chase the estimated costs of making the Improvements regardless of whether it actually incurred those costs. Alternatively, Chase argues that the district court erroneously considered damages as of the date of the property's sale rather than as of the date of breach. The defendants claim that Chase raised neither of these arguments in district court, and that Chase is thus precluded from making them on appeal. See Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc., 54 F.3d 69, 73 (2d Cir.1995) (arguments not raised in district court deemed waived). According to the defendants, Chase's only argument in district court was that it was not required to offer any proof of actual damages because the estimated cost mechanism of the Guaranty operated as a liquidated damages provision.
 
 
 32
 The defendants' waiver argument is unpersuasive. Chase argued in district court that the Completion Cost Guaranty contained "no language ... that Chase must actually expend any funds or even intend to do so" in order to recover from the defendants. Chase's Memorandum in Opposition to Defendants' Motion for Summary Judgement at 4 (May 31, 1995). That is the same argument, albeit in different terms, that Chase makes on appeal. See Chase's Brief at 10-11, 22, 27-32. Judge Baer's opinion reflects that the argument was both raised and considered:
 
 
 33
 Chase ... moved for summary judgment on the grounds that the unambiguous language of the contract at issue required the defendants ... to pay Chase the amount required to complete said renovations.
 
 
 34
 (Emphasis added.) Chase therefore properly preserved that argument for appellate review.
 
 
 35
 Chase did not specifically contend in district court that damages should be measured as of the time of breach. But Chase raises that argument here by way of a challenge to an aspect of the district court's analysis that Chase need not have anticipated. Prior to a ruling, a party cannot be expected to anticipate every aspect of it that may be subject to profitable challenge on appeal. We therefore reject the defendants' contention that Chase waived the arguments which it now makes.
 
 
 36
 2. Merits.
 
 
 37
 A party is entitled to summary judgment only if, "resolving all ambiguities and drawing all factual inferences in favor of the non-moving party, there is no genuine issue of material fact to be tried." Keywell Corp. v. Weinstein, 33 F.3d 159, 163 (2d Cir.1994); see also Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). A dispute concerning a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. A defendant moving for summary judgment must prevail if the plaintiff fails to establish an essential element of its case. See id. at 249, 106 S.Ct. at 2510-11. Summary judgment may be proper in a contract action if the contract is unambiguous, Mellon Bank, N.A. v. United Bank Corp., 31 F.3d 113, 115 (2d Cir.1994), or if the contract is ambiguous but there is no relevant extrinsic evidence of the parties' actual intent. Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993).
 
 
 38
 After submission of competing motions for summary judgment, and incidental to its jurisdictional analysis, the district court found that: (i) Chase suffered no damages because, according to Chase's own employees, the area market was so depressed that "the 'best price' available for the property was the price [Chase] received for the premises in its 'unfinished' condition"; and (ii) Chase's only remaining theory of recovery--that the provision in the Guaranty that requires payment of the sum estimated by the Construction Consultant operates as a liquidated damages clause--was unsustainable because, under New York law, a liquidated clause must be express and cannot operate as a penalty.
 
 
 39
 On appeal, Chase does not contest the district court's rejection of liquidated damages, but does challenge the "best price" analysis on the ground that the district court assessed the bank's loss as of the date of sale rather than as of the date of breach, as generally required by New York law. See Sharma v. Skaarup Ship Management Corp., 916 F.2d 820, 825 (2d Cir.1990), cert. denied, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991); Simon v. Electrospace Corp., 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 232, 269 N.E.2d 21 (1971). Specifically, Chase argues that it suffered damages by reason of the "probable loss of value" attributable to the property's incomplete state, and that "the proper measure of Chase's damages was the cost to complete the renovation not the value the renovations would have added to the Property." These arguments are largely inconsistent, but Chase's point is in one sense well taken. When its witnesses conceded that the Improvements would have added nothing to the sale price, they were speaking as of the 1993 date of sale, not the 1991 date of breach of the Loan Agreement. One Chase employee observed:
 
 
 40
 If we had the building a year before when there were large deals floating around we would have said, yeah, it probably would make sense to turn this into an office building.
 
 
 41
 In its brief, Chase contends that "[t]he Improvements ... would have added significant value to the Property had they been made at the time of the breach and Chase should have been awarded the cost of those Improvements as its damages." We are, of course, bound to assume these facts in Chase's favor in ruling on the defendants' motion for summary judgment.
 
 
 42
 All this might be germane if the Guaranty required Zell and Lurie to pay damages arising out of the breach of the Loan Agreement. But it does not. As explained below, the Guaranty obligates the defendants to pay Chase an ascertainable sum in the event of breach of the Loan Agreement. That sum, however, is not computed as damages resulting from breach. The Guaranty expressly states: "In no event shall this Guaranty be deemed to constitute a guaranty of the payment of the principal or the interest evidenced by the Note and secured by the Mortgage." Chase, of course, is not in terms seeking either principal or interest under the Loan Agreement; but it is seeking to recover in cash some or all of that portion of the principal that was not expended on the Improvements.
 
 
 43
 We think that any liability of the guarantors must be drawn from the wording of the Guaranty, which recites that it is to be construed and enforced in accordance with New York law. Under New York law, guarantee agreements must be strictly construed according to their terms. Caldor, Inc. v. Mattel, Inc., 817 F.Supp. 408, 410-11 (S.D.N.Y.1993); Fehr Bros., Inc. v. Scheinman, 121 A.D.2d 13, 15-16, 509 N.Y.S.2d 304, 306 (1st Dep't 1986). A guarantor's obligation must be "narrowly construed and cannot be extended by construction beyond the plain and explicit language of the contract." Key Bank v. Burns, 162 A.D.2d 501, 503, 556 N.Y.S.2d 829, 830 (2d Dep't 1990). Guarantees are strictly construed because the guarantor "cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty." Caldor, 817 F.Supp. at 411 (internal quotation marks omitted).
 
 
 44
 Under the Loan Agreement, Morton Grove was the party required to complete the Improvements. Under the Guaranty, Zell and Lurie (and the Revocable Trusts) agreed to reimburse Chase for any costs that Chase incurred or was required to incur in connection with the completion of any Improvements that were not finished by Morton Grove. Thus, if Chase expended funds to complete the Improvements, or if Chase was required or undertook to do so, Zell and Lurie would be obligated to reimburse the amounts expended, or a good faith estimate of those amounts. But we think that nothing in the wording of the Guaranty requires Zell and Lurie to pay the estimated cost of Improvements that were not made, were not required to be made, and never will be made.[6]
 
 
 45
 Specifically, Zell and Lurie agreed to pay Chase an amount equal to the excess "of (i) all of [Chase's] Direct and Indirect Costs, other than Interest on Loan, incurred or to be incurred in connection with the lien free completion of the Improvements ... over (ii) the undisbursed portion of the loan as of the date of maturity or [Chase's] acceleration of the loan following an Event of Default." (Emphasis added.) The term "Direct Costs" is defined in the Loan Agreement[7] as "[t]he aggregate costs of all labor, materials, equipment, fixtures and furnishings necessary for completion of the Improvements." The term "Indirect Costs" is defined as "[a]ll costs of acquisition of the Premises and completion of the Improvements other than Direct Costs." The Guaranty is clear and unequivocal: the defendants are obligated to reimburse Chase for its actual costs or for costs that it was to incur.
 
 
 46
 The Guaranty goes on to provide the following method for calculating the liability of Zell and Lurie under the Guaranty in the event of default:
 
 
 47
 We agree that, for purposes of this Guaranty, [Chase's] aforesaid Direct and Indirect Costs shall, at [Chase's] sole option, be equal to either (i) the aggregate amount of such Direct and Indirect Costs actually incurred by [Chase] ... or (ii) the amount of such Direct and Indirect Costs as estimated by the Construction Consultant at any time after maturity or such acceleration of the loan.
 
 
 48
 (Emphasis added.) Chase argues that alternative (ii) in the above quoted passage entitles it to the cost of completing the Improvements as estimated by the Construction Consultant regardless of whether such costs are (or will be) actually incurred. We disagree. The above passage tells how to calculate the guarantors' obligation. But it does not purport to alter the Guaranty's expression of that obligation in terms of those costs "incurred or to be incurred in connection with the lien free completion of the Improvements." (Emphasis added.) That conclusion is further bolstered by the provision in the Guaranty that Chase's Direct and Indirect Costs consist of such costs "incurred, or estimated by the Construction Consultant to be required to be incurred " to complete the Improvements either in accordance with stated or customary industry standards or in accordance with undertakings to future tenants or buyers. (Emphasis added.)
 
 
 49
 Nothing in the Guaranty persuades us that Zell and Lurie agreed to reimburse Chase for costs that it did not incur, is not required to incur, and will never incur. To the extent that the clause on which Chase relies may be said to introduce an ambiguity, that ambiguity must be resolved in favor of the guarantors. See Caldor, 817 F.Supp. at 411; Fehr Bros., 121 A.D.2d at 15-16, 509 N.Y.S.2d at 306; Key Bank, 162 A.D.2d at 503, 556 N.Y.S.2d at 830. We conclude that the Guaranty obligates Zell and Lurie to reimburse Chase only for costs that Chase incurred or that Chase is required to incur in connection with the completion of the Improvements, of which there are none.
 
 
 50
 Chase relies on several New York cases for the proposition that where "there has been a breach of an agreement to complete construction, the measure of damages is the reasonable cost of completion." Chase's Brief at 23 (citing Bellizzi v. Huntley Estates, Inc., 3 N.Y.2d 112, 164 N.Y.S.2d 395, 143 N.E.2d 802 (1957)). That may be so, but does not matter, because Zell and Lurie did not agree to complete the Improvements. Moreover, the principal case on which Chase relies cautions that cost-to-complete damages are unavailable where the purpose of the contract is other than completion of construction, or where the provision that is breached is incidental to completion of construction. See American Standard, Inc. v. Schectman, 80 A.D.2d 318, 322, 439 N.Y.S.2d 529, 533 (4th Dep't 1981). The purpose of the Guaranty, as recited in its first line, was to "induce [Chase] to consummate the captioned transaction and to lend the indicated amount to [Morton Grove] in accordance with" the Loan Agreement. The Guaranty nowhere contemplates that the defendants as guarantors would complete the Improvements, and for that reason cost-to-complete damages are unavailable.
 
 
 51
 We hold that the Guaranty obligates Zell and Lurie to reimburse Chase for any costs that it incurred or is required to incur in completing the Improvements. Because it is undisputed that Chase has incurred and will incur no costs in connection with the Improvements, we conclude that Chase can recover nothing under the Guaranty, and summary judgment should be granted in the defendants' favor.
 
 CONCLUSION
 
 52
 The judgment of the district court dismissing the plaintiff's complaint for lack of subject matter jurisdiction is vacated. This case is remanded to the district court with instructions to enter summary judgment in favor of the defendants.
 
 
 
 [1]
 Because Robert Lurie is deceased, Chase named B. Ann Lurie, the executrix of his estate, as a defendant
 
 
 [2]
 Another developer was also an investor in Morton Grove, but is not a party to this suit
 
 
 [3]
 Subject to the caveat that the Guaranty not "be deemed to constitute a guaranty of the payment of the principal or the interest" on the underlying note or mortgage, the Guaranty provides in relevant part:
 [E]ach of us unconditionally guarantees to you [Chase] the payment by the undersigned of an amount equal to the excess, if any, of (i) all of your Direct and Indirect Costs, other than Interest on Loan, incurred or to be incurred in connection with the lien free completion of the Improvements as required of the Borrower by the Building Loan Agreement, including, without limitation, those Direct and Indirect Costs occasioned by, or arising as a result of, any default under any documents evidencing, securing or relating to the loan ..., over (ii) the undisbursed portion of the loan as of the date of maturity or your acceleration of the loan following an Event of Default under the Mortgage other than the undisbursed Loan Budget Amount for Interest on Loan. We agree that, for purposes of this Guaranty, your aforesaid Direct and Indirect Costs shall, at your sole option, be equal to either (i) the aggregate amount of such Direct and Indirect Costs actually incurred by you from time to time to and including the date on which the Improvements are completed, lien free, and the conditions of the final advance of loan proceeds ... under the Building Loan Agreement have been satisfied in full or (ii) the amount of such Direct and Indirect Costs as estimated by the Construction Consultant at any time after maturity or such acceleration of the loan. Unless the Plans provide for a standard of completion greater than that set forth below, for purposes of this Guaranty, your aforesaid Direct and Indirect Costs shall be deemed to also include (a) Direct and Indirect Costs incurred, or estimated by the Construction Consultant to be required to be incurred, as the case may be, in order to complete the Improvements to a standard equal to the Borrower's standard work letter ... and (b) Direct and Indirect Costs incurred, or estimated by the Construction Consultant to be required to be incurred, as the case may be, in order to complete the Improvements in accordance with the terms and provisions of any contracts of sale, leases, subleases, Permanent Commitment or other agreements, or letters of intent in connection therewith, with respect to occupancy, sale or financing of all or any portion of the Improvements. We agree that any amount estimated by the Construction Consultant as aforesaid, and any determination by the Construction Consultant with respect to industry practices, shall be conclusive for purposes of determining our liability hereunder, provided that the Construction Consultant has made such estimate or determination in good faith. Such payment shall be due no later than ten (10) days following the giving of a written demand therefor from you to each of the undersigned....
 
 
 [4]
 There is no evidence that Chase sent that letter to the Revocable Trusts, to Lurie or his representatives, or to ANB
 
 
 [5]
 There is no allegation in the amended complaint or in any of the papers filed with this Court that ANB was a signatory to the Completion Costs Guaranty
 
 
 [6]
 Chase has not pleaded and has nowhere argued that it ever expected and intended to complete the Improvements at the time it demanded payment from Zell under the Guaranty, or when it filed the complaint. We do not decide whether the outcome of this case would be different otherwise
 
 
 [7]
 The Guaranty provided that "[c]apitalized terms used herein without definition shall have the respective meanings ascribed thereto in the [ ] Loan Agreement."