[950 NYS2d 362]

Turnberry Residential Limited Partner, L.P., Appellant, v Wilmington Trust FSB, Respondent.

First Department, August 28, 2012

**APPEARANCES OF COUNSEL**

*Meister Seelig & Fein LLP*, New York City (*Stephen B. Meister*, *Thomas L. Friedman* and *David E. Ross* of counsel), for appellant.

*Seward & Kissel LLP*, New York City (*Mark J. Hyland, Jeffrey M. Dine* and *Mandy DeRoche* of counsel), for respondent.

**OPINION OF THE COURT**

MOSKOWITZ, J.

This appeal presents us with the rare opportunity to analyze a completion guaranty. This sort of guaranty differs from an instrument that guarantees payment. A guarantee of payment typically guarantees a borrower's debt. A completion guaranty guarantees the completion of a project (usually a construction project) should the borrower be unable to do so. Unlike a payment guaranty that is enforceable only after the primary obligor fails to perform, a completion guaranty is often a primary obligation of the guarantor.

In June 2007, a syndicate of lenders (the Lenders) committed to provide $1.85 billion in financing to two limited partnerships (the Borrowers) for the construction of the Fontainebleau Resort

and Casino in Las Vegas, Nevada (the Project) pursuant to a Credit Agreement dated June 6, 2007. The financing under the Credit Agreement consisted of three loans: a $700 million term loan facility, a $350 million term loan delay draw facility, and an $800 million revolving loan facility (the Revolver).

Defendant Wilmington Trust FSB was the successor Administrative Agent under the Credit Agreement. Wilmington Trust was also the Successor Disbursement Agent under the project's Master Disbursement Agreement (the MDA or Disbursement Agreement), pursuant to which, inter alia, Wilmington Trust was to disburse funds for costs related to the Project.

Plaintiff Turnberry Residential Limited Partner, L.P., is an affiliate of the developer for the Project, Fountainebleau Las Vegas Holdings, LLC (FBLV). Turnberry agreed to provide a Completion Guaranty, dated June 6, 2007, to guarantee payment of "Applicable Project Costs." The Completion Guaranty defines "Applicable Project Costs" as "Project Costs other than Debt Service incurred to complete the Project in a manner consistent with the standards set forth on Exhibit M-2 to the Disbursement Agreement."[1] The Completion Guaranty states that capitalized terms it does not define have the meaning the Disbursement Agreement defines. Accordingly, via the Disbursement Agreement, the Completion Guaranty defined "Debt Service" as "all principal repayments, interest . . . and other amounts payable under . . . the Bank Credit Agreement." "Project Costs," as the Disbursement Agreement defines the term, means "all costs incurred, or to be incurred by the project entities in connection with the development, design, engineering, procurement, construction, installation, opening and completion of the Project in accordance with this Agreement." "Project Costs" also includes Debt Service that "will accrue in respect of Indebtedness of the Companies prior to the Opening Date (but expressly excluding Debt Service in respect of the Retail Facility)."

The Preamble to the Completion Guaranty stated that it was "for the benefit of" the Lenders, and was to "induce" the Lenders to make credit extensions. To carry out its obligations under the Completion Guaranty, Turnberry arranged for a $50 million letter of credit that it then drew upon and placed into a Comple-

---

1. Exhibit M-2 to the Disbursement Agreement sets forth requirements that include: a casino with 1,600 slot machines and 110 table games, a resort with retail space, convention and meeting facilities, a spa and salon, a night club, and a show room, and approximately 5,600 parking spaces.

tion Guaranty Proceeds Account (CGPA). Under certain circumstances, Turnberry was required to deposit another $50 million into the account.

Section 3 (f) (ii) of the Completion Guaranty makes clear that this guaranty is a true guaranty of completion and not a payment guaranty: "[this guaranty] is not a guaranty of indebtedness incurred by the Companies or their Affiliates under the Financing Agreements" and prohibits the use of funds "for any purpose other than the payment of Applicable Project Costs that are then due and payable."

The various agreements governing this project provide several instances where the completion guarantor's obligations survive beyond the life of the project. For instance, section 3 (e) of the Completion Guaranty provides that its obligations "shall not be affected by any exercise of remedies by the [Lenders]," and that the Completion Guaranty "shall continue to be enforceable against the Completion Guarantor, for so long as [the Borrowers] remain obligated to the [Lenders] under the Financing Agreements" and "notwithstanding any transfer of the ownership of [the Borrowers]." The Credit Agreement also reflects this continuing obligation. Section 8 (B) (I) of the Credit Agreement contemplated that an "Event of Default" would trigger the termination of the Commitments under the credit facilities, including the Revolving Loans, and that the Completion Guaranty could continue under these circumstances:

> "(B) if such event is any other Event of Default, either or both of the following actions may be taken: (I) with the consent of . . . either the Required Lenders or the Required Facility Lenders for the respective Facility, the Administrative Agent may, or upon the request of the Required Lenders or the Required Facility Lenders for the respective Facility, the Administrative Agent shall, by notice to Borrowers, declare the Revolving Commitments and/or the Delay Draw Commitment, as the case may be, to be terminated forthwith, whereupon the applicable Commitments shall immediately terminate . . . *during the continuation of an Event of Default, the Administrative Agent and the Lenders shall be entitled to exercise any and all remedies available under the Security Documents*" (emphasis added).

In addition, section 8 (r) of the Credit Agreement provides that upon an Event of Default, "the Lenders shall be entitled to

exercise any and all remedies available under the Security Documents, . . . including the [Completion] Guarantee." Thus, the parties provided for the Completion Guaranty to remain enforceable even if ownership of the project transferred to a third party and even if the borrower defaulted.

Section 4 of the Completion Guaranty stated that the Completion Guaranty was a primary obligation of the Completion Guarantor, was an absolute, unconditional and irrevocable obligation to pay and was "in no way conditioned on or contingent upon any attempt to enforce, in whole or in part the [Borrowers'] liabilities and obligations to the [Lenders]." Thus, the obligations under the Completion Guaranty were separate from those of the Borrowers.

The Completion Guaranty provides that all amounts payable "shall be applied in the manner contemplated by the Master Disbursement Agreement [MDA] for the payment of Applicable Project Costs." The "manner" for payment of Applicable Project Costs" appears in section 2.10.1 (b) of the MDA. This section sets forth the payment priority, or "waterfall" from different funding sources as follows in relevant part:

> "(b) the Current Available Resort Sources as of the Advance Date shall be applied to the Resort Request by applying the following order of priority and in each case until the relevant Resort Source is *Exhausted* (except to the extent otherwise limited below): . . .

> "(ix) then, from funds then on deposit in the Bank Proceeds Account prior to giving effect to the requested Advance;

> "(x) then, from funds available to be drawn under the Bank Proceeds Credit Facility, until the aggregate amount of the Bank Revolving Availability has been reduced to $55,000,000;

> "(xi) then, only on and after the Initial Bank Advance Date, from the making of draws under the *Completion Guaranties* (subject to the proviso in Section 2.6.6);

> "(xii) . . . ; and

> "(xiii) then, only on and after the Initial Bank Advance Date, from the remainder of the Bank Credit Facility" (emphasis added).

Under the MDA, "Exhausted" means:

"(a) with respect to the Equity Funding Account, the time at which all proceeds thereunder have been fully disbursed, (b) with respect to the Bank Credit Facility and the Retail Facility, the time at which the lending commitments under such Facility have been fully utilized (and, in the case of the Bank Credit Facility, the Bank Proceeds Account has no funds remaining on deposit therein), (c) with respect to the Second Mortgage Notes, the time at which no funds remain in the Second Mortgage Proceeds Account, and (d) with respect to the Liquidity Account, the time at which no funds remain on deposit therein."

By letter dated April 20, 2009, Bank of America, as the then-Administrative Agent for the Credit Agreement, advised developer FBLV that "the Required Facility Lenders under the Revolving Credit Facility have determined that one or more Events of Default have occurred and are continuing and that they have requested that the Administrative Agent notify you that the Total Revolving Commitments have been terminated." Although section 8 of the Credit Agreement defines what constitutes an event of default, the letter did not specify what event or events had occurred.

Six weeks later, on June 9, 2009, developer FBLV and related entities filed a petition for bankruptcy protection under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Florida. The bankruptcy filing was an Event of Default under section 8 (f) of the Credit Agreement and automatically caused all Commitments, including the Revolving Loan Commitment, to terminate immediately.[2] Wilmington Trust demanded the funding of the additional $50 million Forced Cash Support Amount under section 2 (b) of the Completion Guaranty, but Turnberry refused.

In January 2010, an unrelated third party purchased the Project through the bankruptcy proceeding, free and clear of all

---

**2.** Defendants claim that plaintiff caused the borrower to file for bankruptcy given that it was the borrower's parent corporation. Plaintiff claims that defendants precipitated the bankruptcy by declaring FBLV in default under the loans and terminating them in April 2009. Who and what caused the bankruptcy and default is largely irrelevant, however, because neither in April 2009 nor on the date of the bankruptcy had FBLV used up $745 million of its formerly available credit.

encumbrances, for approximately $156 million. After paying various administrative and priority claims, there remained approximately $103 million of sale proceeds available for distribution.

In the bankruptcy proceeding, the Project's general contractor and numerous subcontractors and suppliers filed mechanics liens against the Project and proofs of claim aggregating in excess of $300 million. In an adversary proceeding filed in bankruptcy court, the lenders have challenged the validity of these claims and asserted that the lienholders are subordinate to the secured lenders pursuant to a subordination agreement the general contractor signed.

By summons and complaint dated November 9, 2010, Turnberry commenced this litigation seeking a declaration that the purpose of the Completion Guaranty had become frustrated and the return of Turnberry's initial payment of $50 million under the Completion Guaranty.

Wilmington Trust answered, and counterclaimed for: (i) a declaratory judgment that Wilmington Trust properly held the $50 million Turnberry already paid under the Completion Guaranty, and (ii) breach of contract for Turnberry's failure to provide an additional $50 million under the terms of the Completion Guaranty.

By notice dated March 3, 2011, Turnberry moved for summary judgment declaring that Wilmington Trust should return the $50 million to Turnberry, and for summary judgment dismissing Wilmington Trust's counterclaims.

By notice dated April 15, 2011, Wilmington Trust cross-moved for summary judgment dismissing the complaint and granting its counterclaims for breach of contract and declaratory judgment, or alternatively, that discovery be permitted on the parties' intent in entering into the Completion Guaranty.

By order entered November 2, 2011, the court denied Turnberry's motion for summary judgment and granted Wilmington Trust's cross motion for summary judgment. By judgment and order entered January 4, 2012, the motion court, to the extent appealed from, denied Turnberry's motion for summary judgment, and granted Wilmington Trust's cross motion for summary judgment dismissing the complaint and on both its counterclaims, dismissed the complaint and declared that Wilmington Trust properly held the $50 million Turnberry had already paid under the Completion Guaranty and directing Turn-

berry to deposit with Wilmington Trust an additional $50 million with interest. The court further declared that Wilmington Trust could use these funds only to pay "Applicable Project Costs."

The pivotal issue is whether plaintiff's obligations under the Completion Guaranty have yet to trigger because the borrower has yet to reach the $745 million mark under the Revolver. Indeed, it is now impossible for FBLV or its affiliates to borrow that amount because a third party has purchased the project.

The general purpose of a completion guaranty is to give lenders some comfort that the construction project will be completed and consequently that the value for the collateral will be worth more than the loan amount. However, the recent nationwide downturn in the real estate market has, in many instances, rendered the value of the real estate, even with completed construction, a losing proposition for lenders because the decreasing value of the real estate often renders it worth less than the loan. Most, if not all, of the sparse case law concerning completion guaranties are from happier days when the value of the real estate was equal to or worth more than the loans for the construction project. For example, in *1633 Assoc. v Uris Bldgs. Corp.* (66 AD2d 237, 242 [1979]), we determined that the plaintiff could not enforce a completion guaranty where it had purchased property at a foreclosure sale worth more than the sum it expended to complete the building and pay off the liens. This result was appropriate because "to permit recovery under the guarant[y] of completion would enable plaintiff to be more well off than if the contract had been performed" (*id.*). In essence, enforcement of the completion guaranty would have allowed plaintiff to experience a windfall. Similarly, in *Chase Manhattan Bank, N.A. v American Natl. Bank & Trust Co. of Chicago* (93 F3d 1064 [2d Cir 1996]), the Court of Appeals for the Second Circuit refused to enforce a completion guaranty where there was no circumstance whereby the plaintiff bank would ever incur completion costs. Here, if there are sufficient funds, defendant Wilmington Trust, as disbursement agent, will pay the mechanics liens, to the extent the bankruptcy court allows.

Turnberry argues that, because the $800 million Revolver loan was never reduced to $55 million because the Lenders terminated and reduced that loan to zero, the waterfall must stop at section 2.10.1 (b) (x) and never reach the Completion Guaranty. This is an incorrect interpretation that fails to take

into account the rest of the global agreement governing this complicated real estate transaction. Turnberry relies on the subordinate and conditional clause within section 2.10.1 (b) (x) of the waterfall, that provides for application of "funds available to be drawn under the Bank Credit Facility, *until* the aggregate amount of the Bank Revolving Availability has been reduced to $55,000,000" (emphasis added) to argue that its obligations do not trigger until only $55 million remains "unborrowed." But that subordinate clause—"until the aggregate amount of"—relies on there being funds available to be drawn under the Bank Credit Facility. As the motion court correctly determined, if there are no "funds available to be drawn" (because the lenders terminated the line of credit) the "until" provision does not come into play.

Turnberry contends that, in analyzing section 2.10.1 (b) (and the triggering of access to the Completion Guaranty funds), the court misconstrued the defined term "Exhausted" in the MDA and the word "utilized" within that definition.

"Exhausted" is defined as:

> "(a) with respect to the Equity Funding Account, the time at which all proceeds thereunder have been fully disbursed, (b) *with respect to the Bank Credit Facility and the Retail Facility, the time at which the lending commitments under such Facility have been fully utilized (and, in the case of the Bank Credit Facility, the Bank Proceeds Account has no funds remaining on deposit therein)*, (c) with respect to the Second Mortgage Notes, the time at which no funds remain in the Second Mortgage Proceeds Account and (d) with respect to the Liquidity Account, the time at which no funds remain on deposit therein" (emphasis added).

Turnberry focuses on the defined term "Exhausted" in section 2.10.1 (b), stating that $745 million of the $800 million Revolver commitment had to be "made use of" to get to the $55 million mark (at which point funds under the Completion Guaranty could be accessed). But, as noted, "available to be drawn" in subsection (x) qualifies the term "Exhausted" in the beginning of section 2.10.1 (b). Turnberry also ignores the parenthetical in the beginning of section 2.10.1 (b), that states "(except to the extent otherwise limited below)."

It is also notable that the parties were able to differentiate the exhaustion point among the various funding sources. For

instance, "Exhausted" means the "time at which all proceeds thereunder have been fully disbursed" with respect to the Equity Funding Account. With respect to the "Liquidity Account," "Exhausted" means "the time at which no funds remain on deposit therein." Thus, the parties were able to state when they meant to equate the term "Exhausted" with the full use of funds. That they did not do so with respect to the Revolver is most telling.

The Revolver terminated upon developer FBLV's bankruptcy filing and FBLV can no longer borrow under it. Accordingly, the Bank Credit Facility is "fully utilized" (and therefore Exhausted) as a "Current Available Resort Source." Thus, Wilmington Trust as Disbursement Agent can look to the next "Current Available Resort Source" (the Completion Guaranty) for payment of Project Costs.

Under Turnberry's interpretation of section 2.10.1 (b), if a Current Available Resort Source, such as the Bank Credit Facility, becomes unavailable, the Disbursement Agent could never apply another Current Available Resort Source lower in the waterfall to pay Project Costs, such as the Completion Guaranty under section 2.10.1 (b) (xi) or even the remaining $50 million in the Liquidity Account under section 2.10.1 (b) (xii). This interpretation would render meaningless the language providing that the Completion Guaranty survives an event of default. As discussed, section 8 (r) of the Credit Agreement anticipates that Turnberry's obligations under the Completion Guaranty would survive FBLV's bankruptcy. Meanwhile, FBLV's bankruptcy allowed the Lenders to terminate FBLV's credit. If the Lenders could terminate for bankruptcy before the borrower used up all but $55 million of its available loan amount, and Turnberry's obligation's survived that termination, then Turnberry's obligations could trigger even though the borrower did not utilize the full amount under the Revolver. That Turnberry's obligations were also to survive transfer of the project only reinforces this interpretation. It is nonsensical to require the Lenders to lend more money that they might never recoup to a faltering entity, before the Completion Guaranty could trigger.

Turnberry nevertheless argues that the sale of the project frustrated the purpose of the Completion Guaranty because, as there is no further project development, there can be no payments for "Applicable Project Costs," the sole expense to which Completion Guaranty funds applied. Turnberry argues that "Applicable Project Costs" include only those costs "to

complete" the Project. As the Project transferred in the bankruptcy, there can be no costs to "complete" it. Turnberry's reading of "Applicable Project Costs" would only allow payment under the Completion Guaranty for the costs of finally completing the Project and would allow Turnberry to recoup funds disbursed prior to completion, even if completion did not ultimately occur. This argument also fails in light of the terms of the Credit Agreement and section 3 (e) of the Completion Guaranty. These documents provide that Turnberry's obligations survive the Lenders' exercise of remedies and that the Completion Guaranty survives transfer of ownership.

Turnberry argues that Wilmington Trust might use the funds in the CGPA to reduce the debt to the Lenders or pay costs that do not qualify as Applicable Project Costs. However, the judgment requires Wilmington Trust to use the funds in the CGPA only to pay for Applicable Project Costs and there is absolutely no indication that Wilmington Trust will interfere or fail to abide by that order.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Melvin L. Schweitzer, J.), entered January 4, 2012, which, to the extent appealed from as limited by the briefs, denied plaintiff's motion for summary judgment, granted defendant's cross motion for summary judgment dismissing the complaint and for summary judgment upon both its counterclaims, dismissed the complaint, declared that defendant properly holds the $50 million on deposit and may use such funds to pay certain project costs and damages incurred as a result of plaintiff's breach of contract, and declared that defendant is awarded and plaintiff directed to pay defendant an additional $50 million plus prejudgment and postjudgment interest for breach of contract under the terms of the subject guaranty, should be affirmed, with costs.

MAZZARELLI, J.P., CATTERSON, RICHTER and MANZANET-DANIELS, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered January 4, 2012, affirmed, with costs.