In re IONOSPHERE CLUBS, INC., Eastern Air Lines, Inc., Bar Harbor Airways, Inc. d/b/a/ Eastern Express, Debtors.

Eastern Air Lines, Inc., Plaintiff,

v.

Brown & Williamson Tobacco Corp., Defendant.

Eastern Air Lines, Inc., Plaintiff,

v.

Southern Living, Inc., Defendant.

Eastern Air Lines, Inc., Plaintiff,

v.

Indopco, Inc., Deluxe Corporation, Savannah Foods & Industries, Inc., Defendants.

Eastern Air Lines, Inc., Plaintiff,

v.

Deluxe Check Printers, Inc., Cheeseborough–Pond's Finance Corp., Northern States Power Co., and Equifax, Inc., Defendants.

Bankruptcy Nos. 89 B 10448(BRL), 89 B 10449(BRL), 91 B 10287(BRL). Adversary Nos. 98–9122A, 98–9124A, 98–9126A, 98–9127A.

United States Bankruptcy Court, S.D. New York.

May 10, 2001.

Winthrop, Stimson, Putnam & Roberts (by Leo T. Crowley, Sheryl L. Reba), New York City, for Defendants.

Smith, Gambrell & Russell, LLP (by E. Kendrick Smith), Atlanta, GA, for Plaintiff.

Arnall Golden & Gregory, LLP (by Darryl S. Laddin, Timothy A. Baxter), Atlanta, GA, for Plaintiff.

## MEMORANDUM DECISION REGARDING TAX BENEFIT TRANSFER AGREEMENTS

BURTON R. LIFLAND, Bankruptcy Judge.

Before the court is a motion for summary judgment or in the alternative, for bifurcation of the trial, brought by defendants Savannah Foods & Industries, Inc. ("Savannah"),[1] Indopco Inc. ("Indopco"), Cheeseborough Pond's Finance Corporation ("C P"), and Northern States Power Co. ("Northern" and together with CP and Indopco, the "1981 TBT Lessors") relating to tax benefit transfer ("TBT") sale and leaseback agreements ("TBT Agreements") on three aircraft. Also before the court is a motion for summary judgment brought by defendants Brown & Williamson Tobacco Corporation ("B & W") and Southern Living, Inc. ("Southern"), (collectively, the "1983 TBT Lessors"), relating to TBT Agreements similar in form and substance to the 1981 TBT Agreements.

Eastern Air Lines, Inc. ("Eastern") cross-moves for summary judgment on counts one, two, four, five and six of its complaints against the 1981 TBT Lessors and on counts one, two, four and five of its complaints against the 1983 TBT Lessors.

*Background*

Much of the background has been set forth fully in this court's Memorandum Decision Denying Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the Alternative, Abstention dated May 12, 1999 ("Memorandum Decision")[2] and the district court's opinion and order, *In re Ionospere Clubs Inc.*, 1999 WL 717291 (S.D.N.Y.Sept.15, 1999), familiarity with which is assumed.

From 1981 to 1983, Eastern entered into a series of TBT Agreements pursuant to which Eastern transferred income tax ownership of certain aircraft to the defendants, including the right to take tax deductions for depreciation and applicable investment tax credits.[3] Eastern was deemed to have leased the aircraft back for income tax purposes only. The transactions left all other attributes of ownership with Eastern. *In re Ionospere Clubs Inc.*, 1999 WL 717291, *1. For a more complete background on the "short-lived"

---

1. Subsequent to the hearing on these motions, Savannah filed a chapter 11 petition thereby staying this action against Savannah.

2. *Eastern Airlines Inc. v. Brown & Williamson Tobacco Corp. (In re Ionosphere Clubs Inc.)*, Ch. 11, Case No. 89–10448 BRL, Adv. No. 98–9122A, 98–9124A, 98–9126A, 98–9127A (Bankr.S.D.N.Y. May 12, 1999) (No. 8 ), *available at http://www.nysb.uscourts.gov*.

3. Between 1981 and 1983, the Internal Revenue Code (the "IRC") and pertinent regulations permitted companies to enter into transactions whereby they transferred to third parties the income tax attributes associated with the purchase of new capital equipment. Specifically, section 168(f)(8) of the IRC of 1954, as amended by the Economic Recovery Tax Act of 1981, enabled taxpayers who otherwise could not fully utilize the tax benefits generated by the purchase and ownership of new capital equipment to sell the tax benefits to taxpayers who could utilize them.

TBT scenario, see this court's previous decision in *In re Chateaugay Corp.*, 102 B.R. 335, 339–41 (Bankr.S.D.N.Y.1989).

The TBT Lessor typically paid an amount equal to Eastern's cost for the aircraft, with a percentage of the price payable by the TBT Lessor in cash at closing and the balance of the price being financed by non-recourse debt established under the TBT Agreements. The payments owed by the TBT Lessors under the non-recourse debt were equal payments consisting of principal and interest. These payments exactly matched the lease payments that were due from Eastern and were due on the same dates. Therefore, all payments (other than the cash payment at closing) were to be offset and book entry only.

During the first five years of a TBT Agreement for an aircraft, the TBT Lessor was entitled to claim an investment tax credit ("ITC") with respect to the purchase price of the property, including the portion evidenced by the non-recourse note. The ITC was available in the year of purchase, but vested over a five-year period. In addition, the TBT Lessor was entitled to claim depreciation known as accelerated cost recovery tax deductions ("ACRS Deductions"), also with respect to its purchase price of the property, including the non-recourse note.

The TBT Agreements have an average term of eighteen years and include an indemnification clause which provides that if a disqualifying event-an event that invalidates the tax benefit transfer-occurs, Eastern will indemnify the defendants for losses resulting from unrealized tax benefits. *Id.* These indemnification obligations were secured by various assets of Eastern.

In March 1989, Eastern filed for bankruptcy under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). In 1990, in connection with Eastern's desire to sell four of the aircraft that were the subjects of TBT Agreements, Eastern negotiated the release of certain collateral which secured its contingent obligations to indemnify the TBT Lessors. Pursuant to a stipulation (the "1993 Stipulation"), collateral was released and those TBT Lessors whose indemnity claims had been secured by such collateral or guarantees were given replacement letters of credit. Replacement letters of credit were also given to those TBT Lessors who had letters of credit from the outset. Not all of the TBT Lessors were parties to the 1993 Stipulation. Except as expressly modified therein, the 1993 Stipulation provided that the TBT Agreements remained in full force and effect. In addition to replacing the collateral with letters of credit, the 1993 Stipulation provided, *inter alia*, that Eastern would object to the claims of the TBT Lessors to the extent they were invalid under non-bankruptcy law and for cancellation of the letters of credit in the event that Eastern did not have a tax indemnity obligation.

In February and September 1994, this Court authorized Eastern to sell the remaining four aircraft that had been "sold and leased back" under the TBT Agreements. *In re Ionospere Clubs, Inc.*, 1999 WL 717291, *1. In December 1994, this Court confirmed Eastern's Chapter 11 reorganization plan (the "Plan"). *Id.* at 8.

According to the defendants, subsequent to the confirmation of Eastern's Plan, the tax attributes of the TBT Agreements were lost and the defendants (with the exception of B & W) drew on the letters of credit available to satisfy indemnity claims that arose post-confirmation. B & W actually drew on its letter of credit before Eastern's Plan was confirmed. By August 1998, Eastern knew that the TBT Lessors had drawn on the letters of credit, al-

though Eastern asserts that they did not have a right to do so.

Accordingly, Eastern filed six adversary proceedings against the TBT Lessors relating to eight aircraft.[4] Although each of the Complaints differ in certain respects, in general, Eastern alleges, *inter alia,* that the sales of the relevant aircraft were not disqualifying events and, therefore, the defendants had no right to draw on their letters of credit. Specifically, Eastern claims that by drawing on their letters of credit, defendants breached the TBT Agreements and that, as a result of that breach, Eastern is no longer bound by those agreements. Eastern seeks to recover approximately $11 million in damages stemming from the defendants' collection on their letters of credit.

In response, the TBT Lessors sought dismissal of the Complaints for lack of subject matter jurisdiction or, in the alternative, abstention.[5] By order dated May 12, 1999, this court denied defendants' motions in their entirety. Defendants then sought leave to appeal that denial. By decision dated September 15, 1999, the district court denied leave to appeal. *See In re Ionospere Clubs Inc.,* 1999 WL 717291 at *5.

Eastern asserts in counts one, two, four, five (and count six in the case of the 1981 Lessors) of its Complaints that the TBT Lessors breached the TBT Agreements by claiming indemnity payments in the absence of an actual tax loss; that the TBT Lessors failed to obtain independent certification of such claimed payments releasing Eastern from subsequent indemnification obligations and rendering sums received by TBT Lessors wrongfully taken; that the interpretation employed by the TBT Lessors of the indemnity provisions of the TBT Agreements amount to a punitive liquidated damages provision unenforceable under applicable New York principles of equity; that the TBT Lessors are not entitled to further payments or draws of letters of credit, and such letters of credit should be cancelled. Eastern now seeks summary judgment on these counts.

Defendants seek dismissal of the above-mentioned counts of Eastern's complaint, as well as count three, Eastern's claim of suretyship, in their motions for summary judgment. Defendants assert that Eastern has not sufficiently proved that it performed under the TBT Agreements or that the TBT Lessors breached the TBT Agreements; that certain disqualifying events entitled the defendants to draw on the letters of credit; that Eastern is not a surety and is responsible for indemnification obligations; that the TBT Agreements' liquidated damages provisions are enforceable; that New York and Georgia contract law preclude Eastern from requesting quasi-contract relief for unjust enrichment; and that defendants are still entitled to the letters of credit at issue. In the alternative, defendants request that upon a denial of the motion for summary judgment, this court should bifurcate the issues for trial and adjudicate the enforceability of the indemnity provision first.

**Discussion**

Summary judgment may not be granted unless the submissions of the parties taken

---

**4.** Eastern and several of the defendants have since settled. The remaining adversary proceedings involve five aircraft.

**5.** The Defendants also commenced litigation against Eastern in New York state court seeking a declaratory judgment that the TBT Agreements are valid and enforceable according to their terms, and (b) affirmative recovery from Eastern of their attorneys' fees in defending the adversary proceedings in this court and in prosecuting the State Court Action.

together "show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Supreme Court instructs that the standard for ruling on summary judgment, like that of a directed verdict, is if governing law would yield but one reasonable conclusion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

At oral argument of these motions, I noted on the record that it is clear that questions of fact exist regarding when and if Disqualifying Events occurred and what the Lessors' actual damages are, if any. While it appeared that the Notices of Tax Loss certifying that the defendants had tax losses based on a 46% tax rate were questionable, it was not readily apparent that Eastern's calculations regarding the Lessors' actual losses were accurate either. It is clear, however, that enforcing indemnification provisions that result in a windfall to lessors at the expense of other creditors, would be inequitable. (*See* Transcript of Hearing dated January 10, 2001). While the question of precisely when, and if, a Disqualifying Event occurred for each TBT Agreement and the amount of damages incurred thereby remains for a trial, for the purpose of this decision only, I am assuming that at some point each TBT Agreement did suffer disqualification.

### The Tax Indemnity Provisions

Because under certain circumstances, the TBT Agreements could cease to qualify for their special tax status under applicable regulations of the Internal Revenue Code, each TBT Agreement contained tax indemnity provisions which provided that Eastern pay the TBT Lessor upon the occurrence of a "Disqualifying Event" (or "Tax Loss" ).[6] *See* Pl.Ex. 1 § 9.3.2; Def. Ex. 5 § 12.2.1; Def. Ex. 6 § 10.(c)(i). The tax consequence of a Disqualifying Event is that the property is deemed to have been sold back to the lessee, and the lessor is deemed to have received the proceeds equal to the unamortized principal of the purchase money note. Thus, the lessor is forced to recognize income for tax purposes in an earlier year than contracted for in the TBT Agreement.

While each of the TBT Agreements provide for indemnification, the language of the indemnification provisions differ in certain respects. However, the purpose of each of the indemnification provisions was to provide the TBT Lessors with compensation in the event that they would be stopped from enjoying the tax benefits of the full eighteen-year lifetime of the TBT Agreement and were forced to recognize taxable income in an earlier year than originally anticipated. At the time each TBT Agreement was entered into the federal corporate income tax rate was 46%. When the alleged disqualifying events occurred, the federal corporate income tax rate was 35%.[7] When the TBT Lessors

---

**6.** For example, Temp. Treas. Reg. § 5c.168(f)(8) sets forth certain disqualifying events that will cause a TBT agreement to cease being treated as a lease under section 168(f)(8) of the IRC (as in effect at the time). A disqualifying event includes any event whereby the leased property ceases to be "section 38 property" which is specifically defined to exclude property which is used predominately outside the United States.

Treas. Reg. § 1.48–1(g) states that if property is physically located outside the United States during more than 50% of the taxable year (with certain exceptions), the property is treated as having been used predominately outside the United States during that year.

**7.** Under the Tax Reform Act of 1986, the federal government lowered the maximum federal corporate income tax rate from 46%

calculated their damages and drew down on the letters of credit, their calculations of tax loss were based on a 46% tax rate rather than the actual rate at which they paid taxes that year. In Count I of its Complaints, Eastern alleges that the TBT Lessors breached the TBT Agreements by taking indemnity payments in excess of their "Tax Losses" and/or in the absence of a Disqualifying Event. Eastern also contends that interpreting the indemnification provisions in such a way as to provide indemnification as of 1995 at a 46% tax rate instead of the actual 35% tax rate results in a windfall for the TBT Lessors and punitive damages to Eastern. Thus, Count IV of each of the Complaints claims that the liquidated damages provisions in each of the TBT Agreements are unenforceable. The TBT Lessors assert that Count IV of each of the Complaints must be dismissed because a) it is barred by (i) the statute of limitations, (ii) res judicata and the confirmation order, and b) the indemnity provisions are enforceable.

*Statute of Limitations*

The TBT Lessors argue that the statute of limitations bars Count IV because the cause of action accrued at the time Eastern would have been able to declare the indemnity provisions unenforceable-when the TBT Agreements were executed. However, "courts do not make mere hypothetical adjudications, where there is no presently justiciable controversy before the court, and where the existence of a 'controversy' is dependent upon the happening of future events." *See Prashker v. U.S. Guarantee Co.*, 1 N.Y.2d 584, 592, 154 N.Y.S.2d 910, 136 N.E.2d 871 (1956). As noted by the New York Court of Appeals,

> the courts should not perform useless or futile acts and thus should not resolve

disputed legal questions unless this would have an immediate practical effect on the conduct of the parties. The need for judicial intervention is obvious when, because of the actions of one of the parties, a dispute arises as to whether there has been a breach of duty or violation of the law. Then the courts can declare the rights and obligations of the parties, and if a breach is found, compel compliance, award damages or otherwise order appropriate action to be taken.

*New York Public Interest Research Group, Inc. v. Carey*, 42 N.Y.2d 527, 399 N.Y.S.2d 621, 369 N.E.2d 1155 (1977); see also *Wincig v. Chock 574 5th Operating, Inc.*, 100 A.D.2d 775, 474 N.Y.S.2d 51, (N.Y.App. Div.1984).

Here, the cause of action did not arise until the TBT Lessors demanded indemnification payments and drew down on the letters of credit. The parties operated under the terms of the applicable TBT Agreements for between 11 and 13 years, even amending some of those agreements, before any actual controversy arose between them. Eastern could not have become aware of all material facts concerning the alleged cause of action regarding the drawdowns until the TBT Lessors actually served their Notices of Tax Loss and drew down on the letter of credit based on such notices. Accordingly, there was no actual, justiciable controversy until the TBT Lessors took action under the particular indemnity provisions.

*Res judicata*

The TBT Lessors assert that Eastern could have litigated in its chapter 11 cases, the question of whether the indemnification provisions embodied unenforceable penalty clauses and, thus, those claims are now barred by res judicata.

---

to 40% in 1987, and then to 34% in 1988. The rate increased slightly from 34% to 35%

in 1993 and remained unchanged through the time period relevant herein.

Among the purposes of res judicata are to relieve parties of the cost and vexation of multiple lawsuits and encourage reliance on adjudication. *See Corbett v. MacDonald Moving Services, Inc.*, 124 F.3d 82, 91 (2nd Cir.1997) *citing Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). As the Second Circuit has instructed:

> To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same.

*See Id.* at 88, 101 S.Ct. 411, *citing In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir.1985). Essential to the application of res judicata, however, is the principle that the previously unlitigated claim to be precluded *could* and should have been brought in the earlier litigation. *D–1 Enterprises., Inc. v. Commercial State Bank*, 864 F.2d 36, 38 (5th Cir.1989).

The finality interests of res judicata are particularly important in the bankruptcy context, where numerous claims and interests are gathered, jostled, and are determined and released. *See Corbett v. MacDonald Moving Services, Inc.*, 124 F.3d at 91. In the bankruptcy context, the court must ask whether an independent judgment in a separate proceeding would "impair, destroy, challenge, or invalidate the enforceability or effectiveness" of the reorganization plan. *Id.* at 88, *citing Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 875–76 (2d Cir.1991).

An order of confirmation binds the debtor and its creditors whether or not they have accepted the confirmed plan and thus, it has preclusive effect. *See* 11 U.S.C. § 1141(a); *Sure–Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir.1991) (res judicata bars any attempt by parties to reorganization hearing to relitigate matters raised or that could have been raised). "But the scope of that preclusive effect is limited by the content of the reorganization plan and the confirmation order." *Maxwell Communication Corp.v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1044 (2d Cir.1996). *See also Mickey's Enterprises, Inc. v. Saturday Sales, Inc. (In re Mickey's Enterprises, Inc. )*, 165 B.R. 188, 193 (Bankr.W.D.Tex.1994) ("the disclosure statement must give those creditors . . . adequate notice of and information regarding the claims that the debtor as reorganized will be bringing against them under the plan. Failure to do so should generally result in the debtor being barred under the doctrine of res judicata . . ."); *cf. Heritage Hotel Partnership I v. Valley Bank of Nevada (In re Heritage Hotel Partnership I )*, 160 B.R. 374 (9th Cir. BAP 1993) *aff'd*, 59 F.3d 175, 1995 WL 369528 (9th Cir.1995) ("if the debtor fails to mention the cause of action in either his schedules, disclosure statement or plan, then he will be precluded from asserting it postconfirmation."). Res judicata does not apply when a cause of action has been expressly reserved for later adjudication. *D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257, 259–60 (7th Cir.1997).

As noted in the Memorandum Decision, "Eastern's Disclosure Statement, Plan and Confirmation Order are replete with references to the claims of the TBT Lessors . . . ." and of Eastern's possible claims against the TBT Lessors. *See* Memorandum Decision at 15. The Disclosure Statement specifically explained that Eastern had "no information upon which to determine when [the TBT Leases] will

expire or whether they will in fact be terminated, or if they are, whether the subsequent disposition of the [aircraft] by Electra will trigger indemnification obligations." Further, the Disclosure Statement provided that the Eastern intends "to take such actions in respect of the Claims of the TBT Lessors, if necessary, as may be permitted under the 1990 Stipulation, the 1993 Stipulation, and applicable law, so as to prevent the TBT Lessors from reaping a windfall at the expense of the Debtors' general unsecured creditors." *See* Disclosure Statement at 29–30. Moreover, in discussing the events of the chapter 11 case, the Disclosure Statement explains that the settlement in the TBT Cash Order "does not preclude the Trustee from instituting further action to reduce the Debtors' liability in respect of the TBT Claims." *See* Disclosure Statement at 25.

The Plan defined the TBT Claims and the Confirmation Order adopted such definition and provided that this court would retain jurisdiction over disputes relating to such claims "[i]n the event that Eastern, the Liquidating Agent or Liquidating Eastern, as the case may be, and the holders of TBT Claims have not reached a consensual resolution of the allowed Contingent TBT Claims by the time that Liquidating Eastern … proposes to seek a final decree closing Eastern's Chapter 11 Case.…" *See* Confirmation Order at ¶ 131. The Confirmation Order also provided that "(i) notwithstanding anything in the Final Decree to the contrary, the Court shall retain all necessary jurisdiction to adjudicate the Reserved Matters and the Final Decree is automatically deemed to incorporate such retention of jurisdiction, whether set forth herein or not, and (ii) Eastern's Chapter 11 Case shall be reopened pursuant to section 350(b) of the Bankruptcy Code to the extent necessary to permit such adjudication." *Id.*

The Lessors argue that in the context of negotiating the 1993 Stipulation, Eastern realized that whatever claim it had in that regard was ripe and available to be litigated but chose not to do so. However, the 1993 Stipulation provided, *inter alia*, that Eastern would object to the claims of the TBT Lessors to the extent they were invalid under non-bankruptcy law and for cancellation of the letters of credit in the event that Eastern did not have a tax indemnity obligation.

Accordingly, because Eastern sufficiently identified and reserved its contingent claims against the defendants in the 1993 Stipulation, its Disclosure Statement, Plan and the Confirmation Order they are not precluded by the application of res judicata. Moreover, even though Eastern's claim against B & W arguably accrued nine days before confirmation of the Plan, it was never previously addressed or adjudicated by any court and the Confirmation Order expressly identified and preserved Eastern's right to adjudicate this claim and all other "Reserved Matters" up to and beyond entry of the Final Decree.

**Enforceability of the Indemnity Provisions**

Whether a contract clause which nominally prescribes liquidated damages is in fact an unenforceable penalty provision is a question of state law. *United Merchants & Manufacturers, Inc. v. Equitable Life Assurance Society of the United States,* 674 F.2d 134, 141 (2d Cir. 1982). With the exception of B & W, all of the TBT Agreements provide that New York law governs. The B & W Agreement is governed by Georgia law. Under both New York and Georgia law, the enforceability of a liquidated damages clause should be determined as a matter of law. *United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 741 (2d Cir.1989); *Liberty Life Ins. Co. v. Thomas B. Hartley*

*Constr. Co.,* 258 Ga. 808, 809, 375 S.E.2d 222 (1989). Courts will not enforce a liquidated damages provision if it operates as a penalty or forfeiture clause. *Leasing Service Corp. v. Justice,* 673 F.2d 70, 72 (2d Cir.1982). The law is clear that contractual terms providing for the payment of a sum disproportionate to the amount of actual damages exact a penalty and are unenforceable. *Id., citing Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). On the other hand, courts uphold contractual provisions fixing damages for breach when the terms constitute a reasonable mechanism for estimating the compensation which should be paid to satisfy any loss flowing from the breach. *Leasing Service Corp. v. Justice,* 673 F.2d at 73.

■■■ Under both New York and Georgia law, for a court to enforce a liquidated damages clause, the clause must specify a liquidated amount which is reasonable in light of the anticipated probable harm, and actual damages must be difficult to ascertain as of the time the parties entered into the contract. *See Wilmington Trust Co. v. Aerovias de Mexico, S.A.,* 893 F.Supp. 215, 218 (S.D.N.Y.1995), *citing Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d at 425, 393 N.Y.S.2d 365, 361 N.E.2d 1015. *See also Capricorn Systems, Inc. v. Pednekar,* 248 Ga.App. 424 (Ga.Ct.App.2001) (For liquidated damages to be recoverable under a contract, (1) injury caused by the breach

must be difficult or impossible of estimation in fact and not merely contended by the contract; (2) the parties must intend to provide for damages; and (3) the sum stipulated must be a reasonable pre–estimate of the probable loss.) In determining the validity of a liquidated damages provision, an important distinction must be drawn between damages that are difficult to accurately determine in monetary terms and damages which can be accurately established, although through a complicated procedure. *Thorne v. Lee Timber Prods., Inc.,* 158 Ga.App. 226, 227–228, 279 S.E.2d 521 (Ga.Ct.App.1981). Moreover, courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty. *See Howard Johnson International Inc. v. HBS Family Inc.,* 1998 WL 411334 (S.D.N.Y. July 22, 1998); *139 Fifth Avenue Corp.v. Giallelis,* 1996 WL 154108 (S.D.N.Y. April 3, 1996); *Rattigan v. Commodore Int'l Ltd.,* 739 F.Supp. 167 (S.D.N.Y.1990); *In re West 56th Street Assoc.,* 181 B.R. 720 (S.D.N.Y.1995); *Pyramid Centres & Co. Ltd. v. Kinney Shoe Corp.,* 244 A.D.2d 625, 663 N.Y.S.2d 711, 713 (N.Y.App.Div.1997).

## The TBT Agreements

■■ On or about December 21, 1981, Eastern entered into several TBT Agreements with the 1981 Lessors pertaining to Aircrafts 222,[8] 223 and 224.[9] Each aircraft

---

**8.** With respect to Aircraft 222, the TBT Lessors argue that Eastern may not pursue this action because it assigned its rights to Continental under a settlement agreement during the course of Eastern's chapter 11 case. By order dated May 9, 1996, this court approved the settlement agreement and authorized Eastern to bring an adversary proceeding against the relevant TBT Lessors. Eastern is required by the settlement agreement to and

this court's order dated May 9, to pursue its claims as to Aircraft 222 in good faith or otherwise forfeit payments from Continental. Accordingly, Eastern has a financial interest in, and standing to prosecute, this adversary proceeding. *See also* Fed. R. Bankr.P. 7017(a).

**9.** Three other lessors were parties to these TBT Agreements but have since settled with Eastern.

cost a total of $28,215,984. Collectively, the five Lessors paid a cash payment to Eastern totaling 30% of the cost of each aircraft. The balance constituted the lessors deemed debt to Eastern pursuant to non-recourse promissory notes payable over the TBT Agreements' eighteen-year term. As a result of the TBT Agreements, the five lessors were allowed to claim ITC equal to their pro-rata share of 10% of the total cost of the aircraft, as well as ACRS Deductions equal to varying percentages of their pro-rata share of the total cost of the aircraft over the first five years of the TBT Agreements.

As with each of the TBT Agreements, the 1981 TBT Agreement provided that Eastern would indemnify the Lessors for any tax loss as a result of a Disqualifying Event. Eastern's indemnification obligations to the 1981 TBT Lessors were originally secured by liens on certain of Eastern's assets. As noted previously, the 1993 Stipulation, among other things, replaced that collateral with cash collateralized letters of credit.

On September 8, 1995, the TBT Lessors provided Eastern with Notices of Tax Loss claiming that a Disqualifying Event had occurred and that they were entitled to indemnification under section 9.3.2.1 of the TBT Agreement for the resulting loss of their initially contemplated tax benefits as of September 15, 1995. Included with their Notices of Tax Loss, were schedules setting forth the calculations of the TBT Lessors' "Losses." The Schedule of calculations set forth, first, the aggregate amount of corporate income taxes the Lessor that the Lessor initially contemplated paying had no disqualifying event occurred, discounted to September 15, 1995 (the "Benchmark"). Next, the schedule set forth the amount of gain resulting from the disqualifying event explaining that the "amount has been multiplied by the 46% tax rate and the resulting amount of tax ... **has been, and will be, paid in 1995 as follows:...**" This alleged tax loss amount was then reduced to present value and subtracted from the Benchmark. Included with the Notices Of Tax Loss were certifications of independent accountant's as required by the TBT Agreements. It is not disputed that the amount set forth in the schedule, computed at the 46% tax rate rather than the tax rate in effect at the time is not the amount of taxes the Lessor actually paid. The TBT Lessors contend, however, that their computation of damages is proper under section 9.3.2.1 of the 1981 TBT Agreement. Eastern disagrees.

Although Eastern and the TBT Lessors disagree as to the interpretation of section 9.3.2.1, this court can interpret the provision as a matter of law. *See Concord Camera Corp. v. Fuji Photo Film Co., Ltd.,* 2000 WL 1013958 at *24 (S.D.N.Y. Jul 24, 2000). That provision provides for an Indemnity Payment which "shall be sufficient to provide...the same after-tax yield and percentage of after-tax cash flow to equity investment it would have had in the absence of such Tax Loss ..." [10]

---

10. The indemnity provision in the 1981 TBT Agreements provides, in pertinent part, that

> If, for any reason, Lessor shall not have, shall lose the right to claim, shall suffer a disallowance of, or shall be required to recapture all or any portion of the tax benefits initially contemplated to be available to the Group with respect to its Tax Ownership of any Unit, based upon the assumptions contained in section 9.3.1, or if Rent,

the ACRS Deductions or the Interest Deductions shall be allocable to sources within the United States ("any such event hereinafter referred to as a Tax Loss"), as a direct result of [the occurrence of a Disqualifying Event] ... Lessee shall pay to Lessor an amount (an "Indemnity Payment") which ... after giving effect to such Tax Loss, ... shall be sufficient to provide...the same after-tax yield and percent-

Both parties agree that the indemnity clause in the TBT Agreements is formulaic, requiring a mathematical analysis rather than reference to a liquidated sum. Furthermore, both parties agree that such analysis requires a two-prong formula. First, the actual tax liability must be determined. Next, a "benchmark" payment, or the present value of the tax liability initially contemplated incurring over the remainder of the TBT Agreement in the absence of a disqualifying event must be computed. The two figures are compared to assess any resulting net tax loss. For purposes of computing the benchmark figure, the parties agree that the stipulated 46% federal tax rate and 10.6% discount rate is appropriate. However, they disagree as to the calculation of actual tax loss.

TBT Lessors contend that this amount should be computed as the loss of the tax benefits initially contemplated in 1981, with a 46% tax rate. Eastern, however, asserts that the actual tax loss refers to the amount incurred in 1995 as a result of the alleged disqualifying event with a 35% tax rate, and comparison with a benchmark figure yields no net loss of tax benefits. Moreover, Eastern claims that the accountant's certification of such losses was inaccurate and incomplete and any

draws made on the Letters of Credit was unwarranted.

Despite the numerous arguments of the parties, the offers of extrinsic evidence,[11] and the reams of papers filed, this court makes two simple observations. First, although the TBT Lessors argue that the indemnification provision requires the use of a 46% tax rate, their Notices of Tax Loss actually state that the amount they were claiming is what they were actually paying in taxes-"**the resulting amount of tax … has been, and will be, paid in 1995.**" And that is simply not the case. Second, the TBT Lessors' explanation that the provision requiring that the losses be "verified by a firm of certified public accountants of recognized national standing" was simply a requirement that the accountant certify that the math was correct is ludicrous. Obviously, the purpose of a requirement that an independent accountant certify the amounts submitted is to have the accountant certify the correctness of actual tax calculations not just verify that the math is correct.

In 1995 when the disqualifying events allegedly occurred, the TBT Lessors recognized taxable income at approximately 35%, much lower than the 46% federal income tax rate originally anticipated under the agreement. Interpreting the in-

---

age of after tax cash flow to equity investment it would have had in the absence of such Tax Loss. .... The amount of such *Indemnity Payment shall be computed on the same basis and with the same assumptions (including, without limitation, a discounting rate of 10.6%) used in determining the Casualty Values....* The amount of such payment shall be set forth in a statement ... and verified by a firm of certified public accountants or recognized national standing ... stating the basis upon which amounts have been determined in a manner which will permit verification by the Lessee of the calculation thereof, and certifying that such amounts have been determined

pursuant to and in compliance with this section 9.3.2.1.
*See* Def. Ex. 3 § 9.3.2.

**11.** Both plaintiffs and defendants filed motions in limine to exclude certain evidence proffered by the other side. The "objectional" evidence however, was unnecessary and not relevant to the court's consideration of the limited issues upon which partial summary judgment is granted by the court today. The parties, however, may preserve and restate these objections and this court will then consider the admissability of evidence sought to be offered at the trial of the recasted remaining issues.

demnity clause in light of the intent and purpose for which it was written mandates an application of the tax rate in effect at the time the Disqualifying Event occurred. To find otherwise would provide an unfair windfall to the TBT Lessors.

Application of the 46% tax rate to Eastern's indemnity obligation would produce an inequitable result incongruent with the definition of liquidated damages. In light of the differential in the tax rates, the indemnification provision does not bear a reasonable relationship to the TBT Lessors' actual tax liability. Such a disproportional relationship between the amount of damages suffered and the indemnity obligation must be viewed as an unenforceable penalty. *See Pyramid Centres & Co. Ltd. v. Kinney Shoe Corp.*, 663 N.Y.S.2d at 713 (If the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced). Furthermore, easily ascertainable actual damages should be considered when interpreting indemnity obligations. *See In re TWA*, 145 F.3d 124 (holding that enforcing liquidated damages in blatant disregard to actual damages suffered is inequitable and contrary to New York public policy.) The parties agreed that the indemnification would require Eastern to provide to Lessors "the same after-tax yield and percentage of after-tax cash flow to equity investment it would have had in the absence of such tax loss." Thus, actual damages were easily calculable at the time the provision was written simply by mandating the application of the federal income tax rate at the time the Disqualifying Event occurred. Moreover, allowing recovery at a 46% tax rate not only will allow an impermissible windfall payment to the TBT Lessors, it will deplete the estate of funds needed to complete obligations under the Plan thereby prejudicing and penalizing Eastern's other creditors.

■■■■ Although both parties were represented by sophisticated counsel a court must not enforce an otherwise invalid liquidated damages provision merely because it was freely negotiated by sophisticated counsel. *See In re TWA*, 145 F.3d at 135. "Contracts that are void as against public policy are unenforceable regardless of how freely and willingly they are entered into." *Id.*

While the B & W TBT Agreement[12] and the Southern Living TBT Agreement[13]

12. Section 12 of the B & W TBT Agreement contains three different remedies for the TBT Lessors to claim upon a deemed "Tax Loss." A "tax loss" is defined as an event which resulted in the loss of federal tax benefits contemplated. The parties agree that Section 12(1) does not apply.

B & W asserts that the proper provision is Section 12(2) which allows the B & W to be compensated for all then-remaining tax benefits upon the default of the Lessee. Section 12(2) provides that "if such Tax Loss consists of the loss, other than retroactively to 1983, of all or substantially all the then remaining tax benefits contemplated by section 12.1 as being available to the Group...." Lessee shall pay to Lessor in lieu of all other indemnity obligations under this article (i) the Casualty Value for such Aircraft....

Eastern asserts that Section 12(3) applies in this instance because B & W had already taken advantage of all or substantially all of its tax benefits initially contemplated. Section 12(3) provides that if such Tax Loss does not consist of the loss of all or substantially all the tax benefits contemplated by section 12.1 as being available to the Group(6)27 Lessor and Lessee shall negotiate in good faith, using the same assumptions and methodology used to derive the Casualty Values.... to determine a lump-sum payment to be made to Lessor by Lessee that will preserve the after-tax net return......

Eastern asserts that the Casualty Values have an imbedded assumed 46% income tax rate. For the purposes of this motion, B & W accepts such assertion.

13. The Southern Living TBT Agreement, Section 10(c)(i) provides that: "if a Disqualifying Event occurs, Eastern will pay ... sum of (A) the Disqualification Value, determined as of

contain indemnification provisions with different language, the application of those provisions at a 46% tax rate results in the same punitive effect as the 1981 TBT Agreements and are also unenforceable. Accordingly, the proper amount of damages and corresponding draw-down amounts must be determined at trial. *See Brecher v. Laikin*, 430 F.Supp. 103, 106 (S.D.N.Y.1977) (if the clause is rejected as being a penalty, the recovery is limited to actual damages proven); *Pyramid Centres*, 663 N.Y.S.2d at 713 (where liquidated damages provision is deemed a penalty, "plaintiffs should be afforded the opportunity to present evidence, if any, of actual damages").

**The TBT Agreements are Not Void**

■ Even if the TBT Lessors breached the TBT Agreements by failing to obtain proper certifications or calculate proper indemnity amounts, the Agreements are not void. "A party's obligation to perform under a contract is only excused when the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997). *See also Medical Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir.1997). Here, Eastern received the major portion of its bargain at the time it entered into the TBT Agreements when it received payment from the TBT Lessors. Because Eastern already received a substantial benefit of the TBT Agreements, the alleged breach by the TBT Lessors does not go "to the root of the contract" and thus, does not relieve Eastern from its contractual obligation of indemnification. *See In re La-*

*vigne*, 114 F.3d at 387 *quoting Dept. of Economic Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 483 (S.D.N.Y.1996).

**Eastern is Not a Surety**

■ The TBT Lessors move to dismiss Count III of the Complaint in which Eastern asserts that it was a surety to the TBT Lessors and, therefore, any indemnification obligations Eastern may have had under the TBT Agreements is discharged due to the TBT Lessors failure to minimize their tax liability. The TBT Lessors contend that Eastern is an indemnitor rather than surety because Eastern has no direct obligation to a third party, the United States government, in the event of the TBT Lessors' default. *See Fehr Bros., Inc. v. Scheinman*, 121 A.D.2d 13, 509 N.Y.S.2d 304 (N.Y.App.Div.1986) ( A suretyship relation exists whenever a person becomes responsible for the debt of another.) *See also General Authority for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 951 F.Supp. 1097 (S.D.N.Y.1997). I agree. Moreover, Eastern has not opposed the motion to dismiss Count III. Accordingly, Count III of the Complaint is dismissed.

**Unjust Enrichment**

■ Under New York law, the existence of a valid and enforceable contract governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter. *In re Chateaugay* 10 F.3d 944, 958 (2d Cir.1993) *citing Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190

---

the date of such Disqualifying Event, and (B) an amount which, on an After Tax Basis, shall be equal to any interest, penalties or additions to tax payable by Southern as a result of such Disqualifying Event." Eastern asserts that

the Disqualification Values have an imbedded assumed 46% income tax rate. For the purposes of this motion, Southern Living accepts such assertion.

(1987); *see also Mabry v. Pelton*, 208 Ga. App. 891, 432 S.E.2d 588 (Ga.Ct.App.1993) *quoting Ga. Tile Distrib. v. Zumpano Enterprises*, 205 Ga.App. 487, 488, 422 S.E.2d 906 (1992) ("The theory of unjust enrichment applies when as a matter of fact there is no legal contract, but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for."); *Feigen v. Advance Capital Management Corp.*, 150 A.D.2d 281, 541 N.Y.S.2d 797 (N.Y.App.Div.1989) (Unjust enrichment is a quasi-contract claim, and existence of valid and enforceable written contract governing particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of same subject matter.). It is also settled under New York law that a tort claim will not arise "where plaintiff is essentially seeking enforcement of the bargain." *In re Chateaugay*, 10 F.3d at 958, *citing Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 552, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992). Accordingly, the TBT Lessors' motion to dismiss Count V of the Complaint is granted.

**Canceling and Discharging Letters of Credit**

Apparently at this point, only Northern States' letter of credit has any amount available. In light of the above, Eastern's request to discharge and cancel the Northern States Letter of Credit must await determination of Northern States' actual damages.

**Conclusion**

For the reasons set forth above, I find that the indemnification provisions of the TBT Agreements constitute unenforceable punitive damages under applicable New York and Georgia law. However, I do find that questions of material fact remain for trial: when and if each TBT Agreement suffered a Disqualifying Event and the actual amount of damages for which Eastern is obligated to indemnify the TBT Lessors on account of such disqualification based upon the 35% corporate tax rate in effect at the time of such disqualification. Further, for the reasons set forth above, Count Two of Eastern's Complaints alleging that the TBT Agreements are void and unenforceable is dismissed, Count Three of Eastern's Complaints alleging that it was a surety is dismissed and Count Five of Eastern's Complaint alleging unjust enrichment is dismissed. The remaining issues are reserved for trial. The parties are directed to schedule a trial date with chambers.

SETTLE AN ORDER CONSISTENT WITH THIS DECISION.